James P. KARTELL, Plaintiff,

v.

BLUE SHIELD OF MASSACHUSETTS,
Defendant.

Grant RODKEY, Plaintiff,

v.

BLUE CROSS OF MASSACHUSETTS,
Defendant.

Civ. A. Nos. 78–0594–C, 82–0317–C.

United States District Court,
D. Massachusetts.

June 30, 1982.

As Amended July 7, 1982.

Stanley V. Ragalevsky, Warner & Stackpole, Boston, Mass., David I. Shapiro, Dickstein, Shapiro & Morin, Washington, D. C., for plaintiffs.

Thayer Fremont-Smith, Choate, Hall & Stewart, Boston, Mass., for intervenor-plaintiffs.

Reginald H. Howe, Daniel Mahoney, Palmer & Dodge, Boston, Mass., for Blue Cross and Blue Shield of Mass.

## OPINION

CAFFREY, Chief Judge.

This is a private civil antitrust action which was originally filed in March of 1978 by four Massachusetts physicians who request injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, for alleged violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, by Blue Shield of Massachusetts, Inc. (Blue Shield) and Blue Cross of Massachusetts, Inc. (Blue Cross). The Massachusetts Commissioner of Insurance (the Commissioner) intervened as a party defendant, and by order of this Court entered on January 29, 1982, the Massachu-

setts Medical Society (the Society), Grant V. Rodkey and Henry Brown were permitted to intervene "as parties plaintiff in the existing complaint."

In accordance with the suggestion of the Court of Appeals for this Circuit (*Kartell v. Blue Shield of Massachusetts*, 592 F.2d 1191, 1195 (1st Cir. 1979)), in January 1981 the Honorable Walter Jay Skinner of this Court certified certain questions of state law to the Supreme Judicial Court of Massachusetts on a record consisting principally of a Stipulation of Facts and related Exhibits. At that time, Judge Skinner, to whom this case was then assigned, stated that upon his receiving answers to the certified questions, the defendants' pending motion to dismiss would then be treated as a motion for summary judgment to be heard and determined on the same record as the certified questions. In an opinion filed on August 20, 1981, the Supreme Judicial Court answered the certified questions, *Kartell v. Blue Shield of Massachusetts, Inc.*, —— Mass. ——, Mass.Adv.Sh. (1981) 1980, 425 N.E.2d 313, thus rendering the defendants' motion ripe for hearing and decision as a motion for summary judgment. Plaintiffs Kartell, Wilson and Howe filed a motion for partial summary judgment on March 8, 1982. On April 8, 1982, this Court heard oral arguments on both summary judgment motions.

After considering these arguments, as well as the briefs submitted by all parties, I rule that plaintiffs' complaint against Blue Cross and Blue Shield is barred in part by the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). To the extent that plaintiffs' complaint challenges Blue Shield's "ban on balance-billing," discussed *infra*, the complaint is not barred by either the state action doctrine or the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq*, which exempts from the federal antitrust laws "the business of insurance . . . regulated by State law." *Id.*, § 1012(b). I further rule that the "*per se*" standard of antitrust analysis should not be applied to the so-called ban on balance-billing, and that the traditional "rule of reason" standard should be employed.

As a result of these rulings, it follows that defendants' motion for summary judgment should be granted in part and denied in part, and the plaintiffs' complaint should be dismissed in part with prejudice with respect to all defendants, in accordance with the rulings below. It also follows that plaintiffs' motion for partial summary judgment should be denied.

## I. *The Facts*

Although this case has been pending for more than four years, and has been assigned to five different judges of the Court—four of whom have recused themselves—the material facts have not changed since the filing of the complaint or its transfer to the undersigned on March 8, 1982.

Blue Shield and Blue Cross, respectively, are nonprofit, tax-exempt medical service and hospital service corporations, organized to provide "for the preservation of the public health by furnishing medical services at low cost to members of the public who have become subscribers." 1941 Mass.Acts c. 306, preamble. Mass.G.L. c. 176B (Blue Shield); c. 176A (Blue Cross). They are the only corporations of their kind created under their respective enabling statutes.

Blue Shield directly compensates in scheduled amounts those physicians who "participate" in its medical services plan for services rendered to about 96% of Blue Shield's premium-paying subscribers. Participating physicians, in turn, agree to accept Blue Shield's payments in full satisfaction for their services, and not to "balance-bill," *i.e.*, not to seek to recover from Blue Shield subscribers whom they treat any amount in excess of that which Blue Shield has agreed to pay the physician for the service. Except in a few cases not of concern here, Blue Shield does not directly remunerate subscribers in any manner, and does not remunerate non-participating physicians for services rendered to subscribers, unless such services are rendered in an emergency, or outside the Commonwealth.

Blue Cross, on the other hand, is authorized by statute to provide coverage to its subscribers for hospital care and related procedures. Blue Cross does not remunerate any physician for services rendered to Blue Cross subscribers except those physicians who are salaried members of the staffs of institutions, like hospitals, which have entered into agreements with Blue Cross, and those physicians who treat Massachusetts state employees who are subscribers of a Blue Cross plan available only to employees of the Commonwealth.

As permitted by Mass.G.L. c. 176B, § 3, Blue Shield has joined with Blue Cross for the joint administration of their affairs and the issuance of joint subscriber contracts for both medical and hospital services. At this time, defendants' subscribers constitute about 60% of the population of Massachusetts, and about 99% of the Commonwealth's physicians are participating physicians in Blue Shield's medical service plan.

The doctors who are the individual plaintiffs here are all licensed to practice medicine in Massachusetts. All but two are participants in Blue Shield's medical service plan, and all claim to have been materially harmed by certain practices of Blue Cross and Blue Shield.

Specifically, plaintiffs claim that Blue Shield is engaged in illegal price fixing 1) by generally refusing to reimburse physicians who have not signed participating Physicians' Agreements with Blue Shield for services rendered to Blue Shield subscribers, and 2) by requiring that participating physicians (a) accept Blue Shield's reimbursement as payment in full in most cases, and (b) refrain from billing Blue Shield subscribers for any amount in excess of the amount which Blue Shield has agreed to pay participating physicians. Plaintiffs claim that were it not for Blue Shield's so-called ban on balance-billing, participating physicians would be able in many cases to charge and receive higher fees for their

services to subscribers. They also claim that Blue Shield's refusal in most cases to compensate either subscribers or non-participating physicians for services rendered by non-participating physicians wrongfully deprives those physicians of potential patients who, but for Blue Shield's policy of excluding non-participating physicians, would turn to non-participating physicians for treatment.

Plaintiffs further allege that Blue Cross has agreed with Blue Shield to refuse to provide benefits to Blue Cross subscribers for services rendered by physicians other than those rendered by the salaried staff of institutional providers, such as hospitals, and those rendered under Blue Cross' contract covering Massachusetts State employees. Plaintiffs claim that this agreement has had the effect of perpetuating Blue Shield's alleged dominance in the market of providing insurance against the costs of physicians' services.

Plaintiffs further allege that Blue Shield directs its subscribers not to use non-participating physicians, and directs participating physicians not to refer patients to non-participating physicians. Blue Cross, according to plaintiffs, directs its participating hospitals not to employ physicians who do not participate in the Blue Shield plan.

## II. The State Action Exemption

Judge Skinner initially dismissed the complaint in April 1978 on the ground that the challenged practices are immune from federal antitrust attack under the "state action" exemption recognized in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).[1] Recognizing that application of the state action doctrine to the facts of this case called for the "[r]esolution of . . . complex questions of state law," the United States Court of Appeals for the First Circuit reversed the ruling dismissing the complaint and instructed Judge Skinner to seek state court guidance in determining the an-

1. "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unex-

pressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Parker v. Brown*, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943).

swers to these questions, first, by awaiting a forthcoming decision in a related case then pending before the Massachusetts Supreme Judicial Court,[2] and second, if that decision did not present sufficient guidance, to consider "certifying" the relevant questions of state law to the Supreme Judicial Court for that court's consideration. As noted above, questions of state law were eventually certified by Judge Skinner to the Commonwealth's highest court, and were answered by that court in an opinion announced on August 20, 1981. The answers to these questions now enable this Court to determine whether the challenged practices of Blue Shield and Blue Cross constitute "state action," and thus are immune from attack under the federal antitrust laws.

As all parties have noted in their arguments, the state action defense originally announced in *Parker* has been reviewed and restated in two recent decisions of the Supreme Court: *Community Communications Company Inc. v. City of Boulder, Colo.*, —— U.S. ——, ——, 102 S.Ct. 835, 839, 70 L.Ed.2d 810 (1982), and *California Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). The standard articulated in *Midcal*, which was expressly reaffirmed in *Community Communications*, is as follows:

> First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy;' second, the policy must be 'actively supervised by the State itself.'

445 U.S. at 105, 100 S.Ct. at 943 (citations omitted). As noted above, plaintiffs have identified several practices which they claim amount to illegal restraints. The answer of the Supreme Judicial Court to the certified questions clearly disclose whether three of the challenged restraints are

**2.** In this case, *Nelson v. Blue Shield of Massachusetts*, 377 Mass. 746, 387 N.E.2d 589 (1976), the Supreme Judicial Court dismissed the complaint on the grounds that plaintiffs there had failed to exhaust their administrative remedies.

**3.** This agreement, which remains unchanged to this date, provides in relevant part that:

"clearly articulated and affirmatively expressed as state policy," and thus meet the first part of the state action test.

## II(A).  *Question 1(a): The Ban on Balance-Billing*

The first question certified to and answered by the Supreme Judicial Court asks:

1. Is Blue Shield of Massachusetts, Inc. compelled by M.G.L. c. 176B, § 7 or any other Massachusetts statute or required by a clearly articulated and affirmatively expressed State policy (a) to limit fees of participating physicians as described in the Annexed Stipulation [*i.e.*, by requiring the participating physician to accept the fee paid by Blue Shield as payment in full for covered services rendered to Blue Shield subscribers] . . . ?

The Supreme Judicial Court ruled that "we find in G.L. c. 176B no affirmative policy requiring, or authorizing the Commissioner to require, such a restraint. We therefore answer question 1(a) in the negative." *Kartell, supra*, —— Mass. at ——, Mass.Adv.Sh. (1981) at 1986, 425 N.E.2d 313.

The court's exhaustive rationale for its answer to question 1(a) includes a concise history of the fee-limitation practice, *Id.* at ——, Mass.Adv.Sh. (1981) at 1986–94, 425 N.E.2d 313, which was culled from the same Stipulation of Facts and Exhibits now before this court, and which merits paraphrase here.

Blue Shield was incorporated as the first and only medical service corporation organized under G.L. c. 176B on May 6, 1942. On September 18, 1942, the Commissioner, pursuant to his powers under c. 176B, gave his approval to the first subscription contract, the first Participating Physician's Agreement,[3] the first schedule of rates to be

"[t]he Participating Physician agrees to accept as full compensation for all . . . services such payments as are received from the Corporation . . . except in the case of those persons who are entitled only to Limited Indemnification, in which case the physician may make his customary charge to the patient for his services, crediting against such charge the amount set forth for such services in the

charged subscribers, and the first schedule of fees to be paid participating physicians. The original subscription certificate created two classes of subscribers, "unlimited" (those whose personal or family income was below a certain figure, who received under the plan "unlimited" coverage from physicians in return for their premium payments), and "limited" (those whose income was above a certain figure who could be "balanced-billed" by participating physicians for charges in excess of that amount which Blue Shield had agreed to pay participating physicians). In 1951, the "unlimited" class of subscribers was divided into two sub-classes. The sub-class whose membership had higher incomes than those of the lower sub-class also were charged higher premiums; participating physicians received higher payments from Blue Shield for services rendered to subscribers in the higher income group. This subdivision of the "unlimited" group did not affect participating physicians' ability to balance-bill limited subscribers.

In 1956, Blue Cross and Blue Shield initiated the Master Medical Certificate, which provides comprehensive coverage of hospital and medical costs under a single plan, but which did not depart from the income-limit method of determining a subscriber's entitlement to service benefits.

In late 1967, Blue Shield submitted to the Commissioner a proposed "Amended Schedule of Benefits—Blue Shield Portion of Blue Cross—Blue Shield Master Medical Certificate," which introduced the "usual and customary charge" method of compensation. According to the Supreme Judicial Court,

> Blue Shield [by this plan] proposed to substitute for fixed fee schedules a system under which participating physicians would receive 95 percent [5 percent would be subtracted by Blue Shield to cover administrative costs] of the lesser of their usual charge, or the customary charge, for a particular service. The usual charge is calculated by determining the median of all fees charged by a particular

fee schedule in effect at the time the services

physician for a specific service during each six month reporting period. Similarly, the customary charge is established as the mean of all fees reported for a particular service by physicians of like experience and training during each reporting period.

*Id.* at ——, Mass.Adv.Sh. (1981) at 1987–88, 425 N.E.2d 313. While participating physicians under the usual and customary method of compensation are required to accept Blue Shield's fees as payment in full for covered services regardless of a subscriber's income, the advantage to participating physicians of this system (at least in the late 1960s, when lagging Blue Shield fee adjustments were reducing physicians' real compensation because of inflation) was the "promise of higher fees immediately for many services and relatively automatic future adjustments for inflation." *Id.* at ——, Mass.Adv.Sh. (1981) at 1988, 425 N.E.2d 313.

The Commissioner approved the revision of the Master Medical Certificate effective February 1, 1968, and through 1975 Blue Shield "updated usual and customary charges as it deemed appropriate without objection from the Commissioner." *Id.* In 1976, no updating was proposed by Blue Shield due to the fact that its reserves had decreased from $26 million to $1 million during the eighteen months preceding May of 1976. Blue Shield proposed an update of the charges in 1977, which was approved by the Commissioner subject to the qualification that increases in the usual and customary fees not exceed 7 and 4 percent, respectively. In 1978, the Commissioner took the position that updates in the usual and customary fees must receive his prior written approval, which was withheld for the 1978 proposed increases. Thus, the 1977 fee schedules have remained in effect to this date.

In answering question 1(a), the Supreme Judicial Court focused on two elements. The court first examined the language and statutory history of Mass.G.L. c. 176B, and

are rendered."

arrived at the "inescapable" conclusion that "no one familiar with the legislative scheme, either at its inception or immediately prior to the adoption of the present method of compensation, believed that it required the near universal provision of service benefits [*i.e.*, the ban on balance-billing] which is now subject to challenge." The Supreme Judicial Court thus ruled that Blue Shield's near-universal ban on balanced-billing was nowhere "compelled" by the statute in question.

The Supreme Judicial Court similarly found that because § 4 of c. 176B gives the Commissioner the power only to *disapprove* of Blue Shield's methods of compensation if they are outside the range of reasonableness, but not to establish those methods, the Commissioner's "approval in 1967 of the usual and customary method of compensation does not constitute State action for the purposes of anti-trust immunity." *Id.* at —, Mass.Adv.Sh. (1981) at 1993, 425 N.E.2d 313.

Defendants here do not challenge the Supreme Judicial Court's negative answer to question 1(a) as that question was put to the court. They rather contend that the Supreme Judicial Court's rationale requires a finding by this Court that a method of compensation which prohibits participating physicians from balance-billing low- and middle-income subscribers (who the Supreme Judicial Court has ruled were intended by the legislature to be the beneficiaries of c. 176B) is compelled by the statute or by state policy as articulated and implemented by the Commissioner. The defendants' reading of the Supreme Judicial Court's rationale, if accepted, would insulate from antitrust challenge the usual and customary method of compensation as it pertains to low- and middle-income subscribers, leaving for antitrust scrutiny only that part of the method which applies to upper-income subscribers.

■ I decline to adopt the defendants' contention. While it is beyond doubt that Mass.G.L. c. 176B is primarily intended to insure that affordable health insurance will be available to low- and middle- income

residents of the Commonwealth, I find no state law or policy which requires either the Commissioner or Blue Shield to prohibit balance-billing for *any* income-class of subscribers. I adopt the rationale of the Supreme Judicial Court, and rule that no " 'clearly articulated and affirmatively expressed ... state policy,' " *Midcal, supra,* 445 U.S. at 105, 100 S.Ct. at 943, compels the use by Blue Shield of the usual and customary charge method of compensation to participating physicians. As a result, I rule that this practice cannot be shielded from scrutiny under the federal antitrust laws under the state action doctrine of *Parker* and *Midcal*.

### II(B). *Question 2(a): The "lock-out" of non-participating Physicians*

The second question certified to the Supreme Judicial Court asks:

1. Is Blue Shield of Massachusetts, Inc., compelled by M.G.L. c. 176B, § 7 or any other Massachusetts statute or required by any clearly articulated and affirmatively expressed State policy ... (b) to refuse to make payment for non-emergency services provided in Massachusetts by physicians who decline to accept the terms imposed by Blue Shield in their participation agreement, including limitation of such fees?

Finding that "[b]y contrast to question 1(a), question 1(b) involves a relatively straightforward process of statutory construction," — Mass. —, (1981) Mass.Adv.Sh. at 1994, 425 N.E.2d 313, the Supreme Judicial Court ruled "that G.L. c. 176B, § 7, precludes payments by Blue Shield to non-participating physicians for services rendered to subscribers except in cases of emergency or for services rendered outside the State." *Id.*

The Supreme Judicial Court explained its ruling in the following passage:

General Laws, c. 176B, § 7, as appearing in St. 1978, c. 574, § 3 provides in relevant part that "*[a] subscriber or a covered dependent,* subject to the by-laws, rules and regulations of a medical service corporation and the terms and provisions of his subscription certificate, *shall be*

*entitled to the benefits of this chapter upon receiving medical ... service from any participating physician ... or,* in the discretion of the corporation, *upon receiving medical ... service from any nonparticipating physician ... in an emergency or when outside the Commonwealth*" (emphasis added). A nonprofit medical service plan is defined by G.L. c. 176B, § 1, as "a plan operated by a medical service corporation ... whereby the cost of medical ... service ... furnished to subscribers and covered dependents is paid by the corporation ... to participating physicians ... and to such other physicians as are provided for herein ..." Finally, a participating physician is defined as "a registered physician ... who agrees in writing with a medical service corporation to perform medical service for subscribers and covered dependents and to abide by the by-laws, rules and regulations of such corporation." G.L. c. 176B, § 1. These sections, read together, indicate a clear legislative purpose to limit the advantages of reimbursement by Blue Shield—principally the guarantee of prompt payment at a fixed rate—to those physicians who choose to participate in the program.

The Supreme Judicial Court analyzed and rejected the plaintiffs' argument that § 7 of c. 176B merely limits the benefits to which subscribers are entitled, but in no way compels Blue Shield to refuse reimbursement to non-participating physicians for non-emergency services rendered in the Commonwealth.[4] In rejecting this argument, the Court discussed the origins of Blue Shield, highlighting matters of significance to this and later parts of this opinion. The Supreme Judicial Court said:

> To the extent that the language of § 7 is ambiguous, the ambiguity is resolved by reference to the structure and history of

the Blue Shield program as a whole. The critical language of § 7 was included in the initial bill submitted by the Medical Society to authorize the formation of nonprofit medical service corporation, as well as in the successor bill which was ultimately enacted as G.L. c. 176B. The participating physician concept was integral to the original vision of the manner in which medical service plans would operate. Because medical service corporations were to be formed and operated by the medical profession itself, rather than by commercial insurance companies, the drafters of the enabling legislation were faced with the problem of either accumulating the financial reserves required to guarantee the soundness of the program, or finding some acceptable substitute. This problem was addressed by means of the "unit system", under which participating physicians themselves acted as underwriters of risk.

The system was presented to the Commission of Insurance, in a statement from the Medical Society, as a substitute for the reserve requirements of traditional insurance plans. The Medical Society's statement to the Commissioner argued that the unit system "constitutes an actuarial substitute for the necessary large financial reserves of profit-making commercial corporations .... This is necessary in commercial corporations because [financial demands] are directly related to contractually binding, inflexible indemnity schedules. Thus there is substituted in Massachusetts Medical Service, Inc. [now known as Blue Shield of Massachusetts, Inc.] for such large financial reserves, a guaranteed medical-service reserve to the subscribers during the terms of the contract, by participating physicians who accept an unguaranteed and fluctuating

---

**4.** After having argued to the Supreme Judicial Court that c. 176B, § 7, prohibits the payment of benefits to *subscribers*, and *not* to non-participating physicians, plaintiffs argue before this court that c. 176B, § 7, prohibits the payment of benefits to *non-participating physicians*, but does not prohibit the payment of benefits to subscribers for services rendered by

non-participating physicians. I rule that such an attempted end around reverse of the Supreme Judicial Court's clearly-reasoned answer to the question put to it by this Court should be stopped with no gain, for the Supreme Judicial Court's rationale, which is quoted in the body of this opinion, disposes of *both* of plaintiffs' argument on this issue.

schedule of indemnification, the current monetary equivalent of which at any time is determined by an equitable proration of available earned income among the participating physicians" (emphasis added).

The original Participating Physician's Agreement, approved by the Commissioner of Insurance on September 18, 1942, contained the following clause: "Unit System: In the event that the amount available in any accounting period for distribution to Participating Physicians . . . shall be insufficient to pay all Participating Physicians in full, then the amount which the Board of Directors decides is available for distribution shall be paid to all Participating Physicians on a pro rata basis." This agreement remains in use at present.

Obviously, the potential benefits to physicians stemming from participation in the plan were accompanied by an element of risk. Had physicians been free to obtain payment for services to subscribers without incurring the risk of reduced payment under the unit system, there would have been little incentive to participate.

*Id.* at ——, Mass.Adv.Sh. (1981) at 1995–96, 425 N.E.2d 313. The Supreme Judicial Court concluded its analysis of question 1(b) by stating that "[a]gainst this background, we think it clear that the Legislature intended by G.L. c. 176B, § 7, to limit Blue Shield's system of reimbursement to participating physicians, except in those circumstances in which such services could not reasonably be obtained." *Id.* at ——, Mass. Adv.Sh. (1981) at 1996, 425 N.E.2d 313.

■ In light of this controlling interpretation of state law made by the highest court of the Commonwealth, I rule that Blue Shield's practice of restricting to participating physicians remuneration for services rendered to subscribers is " 'clearly articulated and affirmatively expressed as state policy,' " *Midcal, supra,* at 105, 100 S.Ct. at 943, and therefore satisfies the first part of the state action test.

The intervenor plaintiffs claim that Blue Shield's general practice of not remunerating non-participating physicians cannot pass the second part of the state action test, which requires that the challenged restraint "be 'actively supervised' by the State itself." *Id.* They claim that their argument is supported by the fact that Blue Shield subscriber contracts provide that remuneration will be provided to non-participating physicians in the event of emergency, or for services rendered outside of Massachusetts, and then only when the services of a participating physician are not reasonably available, and at the discretion of Blue Shield. There is, however, nothing in plaintiffs' complaint which shows that they are challenging under the antitrust laws the procedure by which Blue Shield determines whether services rendered to a subscriber by a non-participant were rendered in an emergency situation or out-of-state, or whether the services of a participating physician was not reasonably available. Plaintiffs instead are challenging the larger Blue Shield practice of normally remunerating only participating physicians.

■ I rule that since the challenged Blue Shield practice of generally excluding non-participating physicians from remuneration is compelled by c. 176B, § 7, it *a fortiori* passes the second part of the state action test, and is as a result immune from federal antitrust scrutiny under the state action doctrine of *Parker, supra,* and its progeny. Plaintiffs argue that in *Corey v. Look,* 641 F.2d 32 (1st Cir. 1981) the United States Court of Appeals for the First Circuit recently articulated a third rung of the state action test which requires that "the [entity] . . . claiming [state action] exemption illustrate the requisite state legislative intent by demonstrating by convincing reasoning that the challenged restraint is necessary to the successful operation of the legislative scheme that the state sovereign has established." The court in *Corey* ruled that this showing must be made only in cases where "explicit" statutory language was "absent." *Id.* Given the clear language of c. 176, § 7, and the state court's finding that "question 1(b) involves a relatively straightforward process of statutory

construction," I rule that the test articulated in *Corey* need not be considered herein.

Insofar as plaintiffs' complaint challenges this Blue Cross practice, the complaint should be dismissed.

II(C). *Question 2: Blue Shield Forebearance From Generally Providing Benefits for Physician's Services*

The third question certified to the Supreme Judicial Court asks:

2. Is Blue Cross of Massachusetts, Inc. permitted generally under the Massachusetts statutes to make payments to subscribers or physicians for medical services provided by physicians to Blue Cross-Blue Shield subscribers, as it does under its contract insuring employees of the Commonwealth?

One of plaintiffs' theories in this law suit is that Blue Cross has failed to generally provide coverage for its subscribers for services rendered by physicians, other than those services rendered by the salaried staff of institutional providers such as hospitals. Plaintiffs suggest that this failure suggests the existence of an illegal conspiracy between Blue Cross and Blue Shield which allows Blue Shield to dominate the market of health insurance for treatment by physicians. That Blue Cross could offer such coverage under its enabling laws, according to plaintiffs, is demonstrated by the fact that such coverage is provided for those Blue Cross subscribers who are employees of the Commonwealth.

In ruling that the laws of Massachusetts do *not* generally permit such coverage, the Supreme Judicial Court articulated the following rationale, which I adopt:

To respond to Question No. 2 it will be helpful to recast the question into two questions: (a) Is Blue Cross empowered under G.L. c. 176A to cover physicians' services under the caption "other health services" as that phrase is used in G.L. c. 176A, § 7? (b) By what authority is Blue Cross authorized to contract directly with the Commonwealth to cover services of physicians?

The first question (a) must be answered "no." Blue Cross was permitted to provide benefits only for hospital services until 1953. In that year the Legislature amended G.H. c. 176A, § 1, to permit a hospital service corporation to provide "reimbursement for other health services." St. 1953, c. 287, § 1. These "other health services" have included such non-hospital providers as visiting nurse associations, mental health clinics and home health agencies. Authorization for these contracts is found in the fourth paragraph of G.L. c. 176A, § 5.

It has been stipulated that Blue Cross has never provided benefits for physicians' services except (1) covered services rendered by salaried staff physicians of hospitals and certain other institutional provides with which it has contracts; and (2) nonemergency, in-State service rendered by participating and non-participating Blue Shield physicians under the State employees' contract.

The Master Medical Certificate issued to subscribers provides that "[b]enefits contained herein for all services and supplies other than those furnished by a physician, dentist, podiatrist, or psychologist shall be provided by Blue Cross," and that "[b]enefits contained herein for services of a physician, dentist, podiatrist, or psychologist shall be provided by Blue Shield."

It is highly unlikely that the Legislature would authorize Blue Cross and Blue Shield to sail on a collision course of competition for subscribers for coverage of physicians' services when Blue Cross's principal course is directed towards hospital services and Blue Shield's towards physicians' services. Equally improbable is a legislative intent to permit Blue Cross to provide the benefits of a full range of physicians' services on a non-participating basis and thereby escape the network of regulation found in G.L. c. 176B. In short, Blue Cross is not empowered to cover physicians' services except in those instances already noted.

The answer to the second question (b) can be found in G.L. c. 32A, § 4. Blue Cross

is authorized to contract with State employees because the Legislature vested it with such authority. Under this statute, the Group Insurance Commission is authorized to enter into an agreement for insurance coverage for State employees with Blue Cross "in the same manner as any other insurance company."

The authority for contracts with State employees reposes in G.L. c. 32A in the first instance, and not in G.L. c. 176A. The express reference of G.L. c. 176A in G.L. c. 32A, § 4 encourage us to rule that such provision is special and thus, absent a contrary legislative intent, it must prevail over conflicting provisions, if any, in G.L. c. 176A and c. 176B. ... Accordingly, we respond to this question by recognizing that payments to physicians for medical services under the contract between Blue Cross and the Group Insurance Commission are authorized by the express language of G.L. c. 32A, § 4, and, as such, this coverage does not derogate from the exclusiveness of Blue Shield's coverage for physicians' services to subscribers who are not under the contract insuring State employees.

*Id.* at ———— ——, Mass.Adv.Sh. (1981) at 1996–1998, 425 N.E.2d 313. Since general forebearance from the insurance market covering physician's services is clearly required of Blue Cross by state statutes as described above by the Supreme Judicial Court, I rule that this practice satisfies both prongs of the *Midcal* test, and thus is immune under the state action doctrine from antitrust challenge.[5] Thus plaintiffs' complaint should be dismissed insofar as it challenges Blue Cross' forebearance from this market.

### III. *The McCarran-Ferguson Act*

Since this Court has ruled that the agreement of Blue Shield and participating physicians to use the usual and customary method of physician compensation is not immune from antitrust scrutiny under the state action doctrine, we now turn to defendants' claim that this agreement is exempt from the antitrust laws under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015.

■ To establish that the agreements between Blue Shield and its participating physicians are within the protection of the Act, Blue Shield has the burden of meeting three separate tests. First, the agreements must be shown to be the "business of insurance," 15 U.S.C. § 1012(b), as that statutory term has been interpreted by case law since the passage of the Act 40 years ago. Second, the agreements must be "regulated by State law" as required by § 2(b) of the Act. *Id.* Third, "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation" is outside the Act's exemptive powers, and remains subject to the antitrust laws. The undisputed facts at this point must show an absence of any such agreement or action before the defendants may be awarded summary judgment on this issue.

Plaintiffs claim that a recent Supreme Court case, *Group Life and Health Insurance Company v. Royal Drug Company*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), clearly establishes that the agreements in question here are not the "business of insurance" as required by the Act. The Supreme Court in that case was confronted with a scheme whereby Blue Shield of Texas offered insurance policies which entitled the policyholder to obtain prescription drugs from both participating and non-participating pharmacies. If a prescription were obtained under this plan from a participating pharmacy, the insured paid $2 to the pharmacy for the prescription; the pharmacy's wholesale cost was paid to the participating pharmacy directly by Blue Cross. Thus the highest price a participating pharmacy could obtain on prescription sold to a Blue Shield policyholder was its wholesale cost plus $2. If the prescription were obtained from a non-participating pharmacy, the insured paid the entire price charged by the pharmacy to the pharmacy, and was reimbursed by Blue Shield for 75% of the difference between the actual price

---

**5.** *See* discussion of *Corey v. Look, supra.*

and $2. Thus non-participating pharmacies were not limited in the amount that they could charge Blue Shield subscribers.

Suit was brought against Blue Shield by a group of pharmacy owners who alleged that the agreements entered into by Blue Shield and the participating pharmacies amounted to the type of price fixing banned by § 1 of the Sherman Act. The United States District Court for the Western District of Texas granted summary judgment to Blue Shield on the grounds that the agreements met all three tests of the McCarran-Ferguson Act. Upholding the reversal of the trial court by the United States Court of Appeals for the Fifth Circuit, the Supreme Court ruled that the agreements in fact did not amount to the "business of insurance," and thus were not within the protection of the Act. *Id.* at 211–15, 99 S.Ct. at 1073–1075.

`In so holding, the Court articulated what amounts to a two part test that procurement agreements similar to the one examined in *Royal Drug* must meet in order to be considered the "business of insurance." First, the agreement must be concerned in part with the "spreading and underwriting of a *policyholder's* risk." *Id.* at 211, 99 S.Ct. at 1073 (emphasis added). Second, since the "business of insurance" is "commonly understood" to focus on " 'the relationship between the insurance company and the policyholder' ", *Id.* at 215–16, 99 S.Ct. at 1075, *quoting SEC v. National Securities, Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969), the agreements must themselves focus at least in part on the relationship between the insured and the insurer, and not merely on contractual arrangements for the procurement of goods and services.

The Court ruled that the agreement between Blue Shield of Texas and participating pharmacies could not pass either test, and thus were not part of the "business of insurance." The agreements, the Court said, "serve only to minimize the costs Blue Shield incurs in fulfilling its underwriting obligations" to its policyholders. *Id.* at 213, 99 S.Ct. at 1074. As long as Blue Shield is able to keep its contractual obligation to its policyholders that they will not have to pay more than $2 per prescription to participating pharmacies, "policyholders are basically unconcerned with the arrangements made between Blue Shield and participating pharmacies." *Id.* at 214, 99 S.Ct. at 1074. The court continued:

> By agreeing with pharmacies on the maximum price it will pay for drugs, Blue Shield effectively reduces the total amount it must pay to its policyholders. The Agreements thus enable Blue Shield to minimize costs and maximize profits. Such cost-saving arrangements may well be sound business practice, and may well insure ultimately to the benefit of policyholders in the form of lower premiums, but they are not the business of insurance.

*Id.*

■ The agreements between Blue Shield and participating physicians challenged here by plaintiffs are in substance the same as those agreements which were ruled to be outside the realm of the "business of insurance" in *Royal Drug*, with one exception—a difference which Blue Shield argues brings these agreements within the *Royal Drug* definition of the "business of insurance." As was described in detail by the Supreme Judicial Court of Massachusetts in excerpts from its *Kartell* decision reproduced above, the "unit system," by which participating physicians agree to be compensated for their services rendered to Blue Shield subscribers on a *pro rata* basis if Blue Shield is unable at any time to compensate participating physicians in full because of a depletion of Blue Shield funds, has been an integral part of the agreement between Blue Shield and participating physicians since the creation of Blue Shield 40 years ago. Blue Shield argues that "[u]nlike the pharmacy agreements at issue in *Royal Drug*, Blue Shield's agreements with its participating physicians [by inclusion of the unit system] place underwriting risk on the physicians." Plaintiffs counter that the "unit system" is a "relic" of the early years of Blue Shield, and make much

of the fact that Blue Shield has never in its history had to resort to *pro rata* compensation because of a depletion of its funds. I concur with Blue Shield and the Supreme Judicial Court that the unit system remains an integral part of the larger Blue Shield plan, and continues to place some amount of risk on participating physicians. That this risk is perhaps a significant risk is underscored by the fact that, as noted above, Blue Shield in 1976 made the decision not to upscale its usual and customary fee schedule in 1976 due to the fact that its funds available for physician compensation had dramatically dropped from $26 million to $1 million in an 18-month period.

■■■ I further rule that the fact that the "unit system" forces participating physicians to carry some risk is not enough by and of itself to satisfy the first test of *Royal Drug*. The risk accepted by the participating physicians is the risk that at any time Blue Shield may not have sufficient reserves to satisfy participating physicians' claims for remuneration. This is a risk which, absent the participating physicians' agreement to carry it, would be carried by Blue Shield, not by the subscribers. By agreeing to carry the risks inherent in the "unit system," participating physicians no doubt enable Blue Shield to cut the costs of maintaining the higher reserves that private insurance companies not able to employ the unit system must maintain. As is noted above, this is the result the Supreme Judicial Court found was intended by the state legislature in including the unit system in c. 176B. And it is also true that these lower costs may result in lower subscriber premiums. But the Supreme Court has ruled in *Royal Drug* that the fact that an agreement between an insurance company and a third party may result in lower premiums to policyholders is not enough to qualify that agreement as the "business of insurance." As the court stated, "The [McCarran-Ferguson Act] exemption is for the 'business of insurance,' not the 'business of insurers.'" *Id.* at 211, 99 S.Ct. at 1073. I therefore rule that the agreements here in question between Blue Shield and participating physicians do not qualify as the "business of insurance," and thus are not exempt from the federal antitrust laws under the McCarran-Ferguson Act.

### IV. *Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs claim that the general ban on balance-billing contained in Blue Shield's agreements with its participating physicians constitutes a violation of § 1 of the Sherman Act, and have moved for partial summary judgment on this issue pursuant to Fed.R.Civ.P. 56. The question of whether agreements such as the one examined here are violations of § 1 is currently being litigated in at least two other federal courts (see discussion below), and the Supreme Court recently stated that it has not yet been presented with this exact question, and thus has not yet expressed an opinion on whether these agreements are in violation of the Sherman Act. *Arizona v. Maricopa County Medical Society*, —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), Opinion of the Court, n.26.

■■■ After considering all of the parties' oral arguments and briefs on this issue, I rule that this agreement does not rise to the level of a *per se* violation of the Sherman Act, and that the facts have not been sufficiently developed at this point in time to allow a proper determination to be made as whether the agreement violates the "rule of reason" standard which more commonly is used to determine violations of § 1. Consequently, plaintiffs motion for partial summary judgment should be denied.

■■■ The words of § 1 of the Sherman Act make unlawful "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Plaintiffs' primary theory of Blue Shield's § 1 liability is that the ban on balance-billing is *per se* violative of § 1. Antitrust case law has determined that restrictive agreements which are "manifestly anticompetitive" are violative *per se* of § 1. *See, e.g., Continental T.V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36,

49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Plaintiffs here claim that the agreements between Blue Shield and its participating physicians are similar to agreements which have been struck down by the Supreme Court as "manifestly anticompetitive" despite the fact that the agreements set maximum as opposed to minimum prices at which the goods in question may be sold to third parties. *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (publisher's establishment of maximum resale price of newspapers sold by carriers held *per se* violative of § 1); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (distiller's agreement on maximum resale price of liquor sold by distillers held *per se* violative of § 1). Plaintiffs correctly point out that the *per se* prohibition of § 1 applies as much to professional services such as medical treatment as it does to the "commodities" involved in the cases cited above. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 786–788, 95 S.Ct. 2004, 2013, 44 L.Ed.2d 572 (1975).

Blue Shield, on the other hand, argues that the *per se* standard should not be applied to its agreements with participating physicians, and relies for support on recent cases from the United States Court of Appeals for the Second Circuit and the United States District Court for the Northern District of California. In *Medical Arts Pharmacy v. Blue Cross & Blue Shield of Connecticut*, 675 F.2d 502 (2d Cir. 1982), the Court of Appeals for the Second Circuit upheld a decision of the United States District Court for the District of Connecticut by ruling that agreements between Blue Cross and participating pharmacies in which the maximum prices that the pharmacies could charge Blue Cross subscribers was set were not *per se* violative of § 1. The agreements in this case were almost duplicates of the agreements examined by the Supreme Court in the *Royal Drug* case, discussed above, in that Blue Cross subscribers who patronized "participating"

pharmacies (*i.e.*, those who had entered into agreement with Blue Cross) were required at most to pay the pharmacy a small "deductible" amount, and the pharmacy was reimbursed by Blue Cross at the rate established in the agreement; subscribers who patronized non-participating pharmacies paid the pharmacies the over-the-counter prices for prescriptions, and were reimbursed by Blue Cross at the rate established in the subscriber agreement with Blue Cross.

In finding that the agreements were not *per se* violative of § 1, the district court distinguished the case before it from cases in which agreements fixing maximum prices had been struck down as unlawful. The court found that Blue Cross was in fact a bulk purchase of drugs for its subscribers; thus the agreements between Blue Cross and the participating pharmacies did not restrain the pharmacies from setting their own price for their goods and services to third parties. *Medical Arts Pharmacy v. Blue Cross & Blue Shield of Connecticut*, 518 F.Supp. 1100, 1107 (D.Ct.1981). *See Sitkin Smelting & Refining Co., Inc. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978) (the *per se* rule applies to "an agreement to fix the price to be charged in transactions with third parties, not between the contrasting parties themselves"). On appeal, the plaintiff argued that only the Blue Cross subscriber could be viewed as the purchaser of prescriptions from participating pharmacies. In ruling that the district court properly refused to apply the *per se* standard, the Court of Appeals for the Second Circuit stated that

even if Blue Cross cannot be characterized as the purchaser for the purpose of antitrust analysis, we consider the pharmacy agreements to be sufficiently different from the maximum price-fixing agreements struck down in *Albrecht* and *Kiefer-Stewart* to preclude application of the *per se* rule. ... Whether Blue Cross is characterized as a purchaser or as an indemnitor or third party payor, it is the ultimate payor, and therefore its pre-

scription drug plan differs significantly from the vertical arrangements to restrict prices that [have been] invalidated. 675 F.2d at 505–6. After noting that the "pharmacy agreements are novel restraints, with potential procompetitive effects," and citing several cases and law review articles for the proposition that the *per se* rule should not be lightly applied to business relationships with a potential for enhancing competition, the court ruled that the district court properly determined that the agreements must be analyzed under the lower "rule of reason" standard. *Id.* at 505.

■ I find the reasoning of the Second Circuit in this case to be cogent and persuasive. The restrictive agreements here challenged by the plaintiffs do not differ in substance from the agreements scrutinized in *Medical Arts Pharmacy*.[6] That the entities entering into the agreements are here doctors, as opposed to pharmacists, and that the subject matter of the agreements here involves the rendering of medical services, as opposed to the sale of prescription drugs, are distinctions without differences for purposes of determining under the antitrust laws whether Blue Shield is the "ultimate payor" of the services whose price has been fixed, and thus has the ability to restrict the price that can be received for those services. I therefore rule that the agreements here challenged by the plaintiffs should be examined under the traditional rule of reason standard to determine whether they are in violation of § 1 of the Sherman Act. *Accord: Sausalito Pharmacy, Inc. v. Blue Shield of California*, 1980–81 CCH Trade Cases 77, 722 (N.D.Cal.1980) ("*Sausalito I*"), and 1981–2 CCH Trade Cases 75, 604 (N.D.Cal.1981) ("*Sausalito II*").

■ Both plaintiffs and Blue Shield argue in their respective memoranda in support of their summary judgment motions that they should prevail under the rule of reason analysis. This standard "requires the factfinder to determine whether, under all of the circumstances of the case, including the facts peculiar to the business and the history of, reasons for, and market impact of the restraint, the restrictive practice imposes an unreasonable restraint on competition." *Medical Arts, supra,* at 504. In light of the very limited discovery that has taken place in this case despite its four-year life-span, I rule that sufficient facts have not yet been developed to allow a proper determination under the rule of reason standard. Therefore, both plaintiffs' and Blue Shield's motions for summary judgment on this issue should be denied and an order will enter directing the parties to conduct discovery on this issue. The discovery must be completed by November 1, 1982.

## V. Conclusion

As stated above, two of defendants' practices here challenged under the Clayton and Sherman Acts are immune from federal antitrust scrutiny. These practices are Blue Shield's refusal, with limited exceptions, to compensate non-participating physicians for medical services rendered to its subscribers, and Blue Cross' forebearance generally for the medical service insurance market inhabited by Blue Shield. Blue Shield's practice of requiring its participating physicians not to charge Blue Shield subscribers any amount over and above that which Blue Shield has previously agreed to

---

**6.** Plaintiffs claim that *Medical Arts* can be distinguished from the case before the Court because [1] the Blue Cross scheme in *Medical Arts* (unlike the Blue Shield scheme here) allowed subscribers to be at least partially remunerated for subscriptions obtained from non-participating pharmacists; and [2] that the district court judge specifically found in *Medical Arts* that Blue Cross occupied only about 9% of the relevant market, as opposed to Blue Shield's occupation of 60% or more of the relative market here. I first note that this finding

by the court was made during its "rule of reason" analysis and was not mentioned by the court during its examination of the *per se* approach. 518 F.Supp. at 1108, n.9. In any event, neither of these considerations are relevant to the inquiry of whether the *per se* standard should be applied; both, of course, may be highly relevant (as they were in *Medical Arts* at both the trial and appellate stages) to the determination of whether the restrictive agreements violate the "rule of reason."

pay them on behalf of its subscribers is not exempt from antitrust challenge under either the state action doctrine or the McCarran-Ferguson Act. This Court, however, will at the appropriate time apply to this practice the "rule of reason," as opposed to the *per se* standard of antitrust analysis.

Order accordingly.