**James P. KARTELL, M.D., et al, Plaintiffs,**

v.

**BLUE SHIELD OF MASSACHUSETTS, INC., et al, Defendants.**

Civ. A. No. 78–594–C.

United States District Court, D. Massachusetts.

March 19, 1984.

As Amended March 22, 1984.

---

19. *See* September 9, 1976 Competency Hearing Transcript at 27–33.

Stanley V. Ragalevsky, Warner & Stackpole, Boston, Mass., Daniel Stark, David I. Shapiro, Dickstein, Shapiro & Morin, Washington, D.C., for plaintiffs.

Thayer Fremont-Smith, Kenneth Laurence, Lee T. Gesmer, Choate, Hall & Stewart, Boston, Mass., for intervening plaintiffs.

Reginald Howe, Daniel Mahoney, Palmer & Dodge, Boston, Mass., for defendants Blue Shield of Mass.

H. Reed Witherby, Asst. Atty. Gen., Boston, Mass., for intervening defendant Com'r of Ins.

## OPINION

CAFFREY, Chief Judge.

This is a private civil antitrust action which was originally filed against Blue Shield of Massachusetts, Inc. (Blue Shield) and Blue Cross of Massachusetts, Inc. (Blue Cross) in March of 1978 by four Massachusetts physicians. They request injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, for alleged violations

of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. The Massachusetts Commissioner of Insurance (the Commissioner) intervened as a party defendant in August 1979, and, in January 1982, by order of another judge of this Court, the Massachusetts Medical Society (the Society), Grant V. Rodkey, M.D. and Henry Brown, M.D. (collectively, "intervenor-plaintiffs") were permitted to intervene "as parties in the existing complaint."

The route from initial filing of the complaint six years ago to the 37-day non-jury trial of the case before this Court has been circuitous and tortuously slow, replete with procedural skirmishes and internecine disputes among plaintiffs who are represented by three different law firms. The case has been assigned to five different judges of this Court, the first four of whom recused themselves. In one form or another, the matter has already been before the Supreme Judicial Court of Massachusetts on certified questions of Massachusetts law, and it has been before the Court of Appeals for the First Circuit on two occasions on appeals from rulings made by other members of this Court. See 592 F.2d 1191 and 687 F.2d 543.

The original complaint was filed on March 10, 1978, and amended shortly thereafter. In the amended complaint, plaintiffs, now joined by intervenor-plaintiffs, allege that Blue Shield, in concert with Blue Cross, has restrained trade illegally in Massachusetts in both the market for physicians' services and the market for health insurance, in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Specifically, plaintiffs allege[1] that Blue Shield engaged in unlawful price setting and restraint of trade in two ways: first, by requiring in most cases that physicians

who have signed Participating Physicians' Agreements accept Blue Shield's reimbursement as payment in full; second, by refusing to reimburse doctors who have not signed Participating Physicians' Agreements with Blue Shield for services rendered by them to Blue Shield subscribers, except for services rendered in emergencies or rendered outside of Massachusetts.[2]

On August 3, 1978, the Honorable Walter J. Skinner dismissed the amended complaint on the grounds that the challenged practices are compelled by state law, and are thus immune from antitrust attack under the "state action" doctrine enunciated by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The Court of Appeals for the First Circuit vacated that judgment in *Kartell v. Blue Shield of Massachusetts, Inc.*, 592 F.2d 1191 (1st Cir.1979), ruling that the district court should have abstained from deciding the state law question—whether defendants' allegedly illegal practices were required by state statute. The Court of Appeals directed Judge Skinner to await the outcome of a case then pending before the Supreme Judicial Court of Massachusetts, *Nelson v. Blue Shield of Massachusetts, Inc.*, 377 Mass. 746, 387 N.E.2d 589 (1979), in which that issue was likely to be decided. The Court of Appeals added that, if the decision in the *Nelson* case did not provide sufficient guidance, Judge Skinner should consider certifying the relevant questions of state law to the Supreme Judicial Court for its consideration. *Id.* 592 F.2d at 1195.

After determining that the Supreme Judicial Court's decision in *Nelson* did not speak to the statutory issues central to this case,[3] Judge Skinner certified two ques-

---

**1.** As is explained more fully below, the only remaining claim is that challenging the ban on balance billing.

**2.** The plaintiffs also complain (1) that Blue Cross helps perpetuate Blue Shield's control over the compensation that can be earned by physicians by refusing generally to compensate physicians other than salaried health care providers on the staffs of institutions, primarily hospitals, that enter into agreements with Blue

Cross; (2) that Blue Shield directs its subscribers not to use non-participating physicians, and its participating physicians not to refer patients to non-participating physicians; and (3) that Blue Cross directs its participating hospitals not to employ non-participating physicians.

**3.** In *Nelson*, the Supreme Judicial Court ultimately dismissed the complaint on the grounds that plaintiffs had failed to exhaust their administrative remedies.

tions to the Supreme Judicial Court in January 1981. The questions were:

1. Is Blue Shield of Massachusetts, Inc. compelled by M.G.L. c. 176B, § 7 or any other Massachusetts statute or required by any clearly articulated and affirmatively expressed State policy (a) to limit fees of participating physicians as described in the annexed Stipulation and (b) to refuse to make payment for non-emergency services provided in Massachusetts by physicians who decline to accept the terms imposed by Blue Shield in their participation agreement, including such limitation of fees?

2. Is Blue Cross of Massachusetts, Inc. permitted generally under the Massachusetts statutes to make payments to subscribers or physicians for medical services provided by physicians to Blue Cross-Blue Shield subscribers, as it does under its contract insuring employees of the Commonwealth?

The Supreme Judicial Court answered the certified questions on August 20, 1981, in *Kartell v. Blue Shield of Massachusetts, Inc.*, 384 Mass. 409, 425 N.E.2d 313 (1981). The Supreme Judicial Court's ruling enabled this Court to entertain cross-motions for summary judgment in April 1982.[4] In its memorandum and order of June 30, 1982, this Court held that the state action doctrine of *Parker v. Brown, supra,* immunizes most of the challenged conduct from antitrust attack. *Kartell v. Blue Shield of Massachusetts, Inc.*, 542 F.Supp. 782 (D.Mass.1982). This Court ruled, however, that, to the extent that plaintiffs' complaint challenged Blue Shield's ban on balance billing, described *infra,* it is not barred by either the state action doctrine or the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*, which exempts from the federal antitrust laws "the business of in-

surance ... regulated by State law." *Id.* § 1012(b). This Court ruled, moreover, that it should not apply a "per se" price-fixing analysis to the ban on balance billing, but rather that it should apply a "rule of reason" analysis. Thus four years of legal sifting have yielded one central issue for this Court to resolve at trial: whether, as judged under the rule of reason, Blue Shield's ban on balance billing by participating physicians imposes an unreasonable restraint on competition.

The case was tried non-jury to this Court for 37 trial days, beginning on April 19 and continuing until June 23, 1983. Plaintiffs and intervenor-plaintiffs called 24 witnesses for their case in chief and four rebuttal witnesses, resting their case on June 2, 1983. Defendants Blue Cross and Blue Shield called 12 witnesses between June 6 and June 22, and two witnesses in surrebuttal. Plaintiffs offered 176 exhibits which were accepted into evidence by the Court; defendants offered, and the Court accepted, 105 exhibits. These exhibits run to hundreds of pages containing thousands of numbers. This over-production has given the Court the near-impossible task of deciding the credibility of two competing, undigestible piles of paper.[5] The Commissioner of Insurance called no witnesses and offered no exhibits.

This opinion will constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. Parties

### A. Plaintiffs

1. Plaintiffs James P. Kartell, M.D. and Herbert W. Horne, M.D. and the intervenor-plaintiff Henry Brown, M.D. are physicians who reside in and are licensed to practice medicine in Massachusetts. They

---

**4.** The case was transferred to the undersigned on March 8, 1982, after Judge Skinner recused himself.

When I first met with counsel in this case on April 1, 1982, I informed them that I had subscribed to Blue Cross/Blue Shield for many years, and continue to subscribe to the program. I then asked counsel to make any objections to

my hearing the case a matter of record at that time. None of the parties objected.

**5.** Counsel for all parties in the case were unresponsive and unhelpful when the Court asked them for their suggestions as to how they expected the Court to resolve the credibility of these two competing mountains of mostly meaningless papers.

do not participate in Blue Shield's medical service plan and are not parties to any written agreement with Blue Shield with respect to the performance of medical or surgical services.

2. Plaintiff Harry D. Wilson, M.D. and intervenor-plaintiff Grant V. Rodkey, M.D. are physicians who reside in and are licensed to practice medicine in Massachusetts. They participate in the medical service plan administered by Blue Shield and each has executed a Participating Physicians' Agreement.

3. The intervenor-plaintiff Massachusetts Medical Society is a non-profit, special act corporation organized and existing under the laws of the Commonwealth of Massachusetts. Its 11,000–12,000 members include both participating and non-participating physicians.

### B. Defendants

1. The defendant Blue Shield of Massachusetts, Inc., is a private, non-profit medical service corporation organized and existing under the laws of Massachusetts, with a principal place of business at 100 Summer Street, Boston, Massachusetts. Blue Shield is the only medical service corporation organized under Chapter 176B of the Massachusetts General Laws.

2. The defendant Blue Cross of Massachusetts, Inc., is a private, non-profit hospital service corporation organized and existing under the laws of Massachusetts, with a principal place of business also at 100 Summer Street, Boston, Massachusetts. Blue Cross is the only hospital service corporation organized under Chapter 176A of the Massachusetts General Laws.

3. The intervenor-defendant Commissioner of Insurance for the Commonwealth of Massachusetts is responsible under Chapter 176B of the Massachusetts General Laws to oversee and approve the structure and practices of Blue Shield.[6]

### II. The Facts

Although this case has been pending for six years, the material facts have not changed since the original filing, nor, generally, are they disputed.[7]

Blue Shield is a medical service corporation, and Blue Cross is a hospital service corporation. They are organized under state law to provide "for the preservation of the public health by furnishing medical services at low cost to members of the public who become subscribers." 1941 Mass.Acts c. 306, preamble; Mass.G.L. c. 176B (Blue Shield); c. 176A (Blue Cross). As permitted by Mass.G.L. c. 176B, § 3, and c. 176A, § 5, Blue Shield has joined with Blue Cross for the joint administration of their affairs and for the issuance of joint subscriber contracts for both medical and hospital services.

Blue Shield directly compensates those doctors who participate in its medical services plan for services they render to about 90% of Blue Shield's subscribers. Participating physicians, in turn, agree to accept Blue Shield's payments (Blue Shield's "allowable") as payment in full for their services, even if the amount Blue Shield determines it will pay is less than the doctor's normal charge for his services. Participating doctors may not bill their patients for the balance. This feature is known as Blue Shield's ban on balance billing. Except in a few cases not of concern here, Blue Shield does not directly remunerate subscribers in any manner, and does not remunerate non-participating physicians for services rendered to subscribers, unless such services

---

**6.** As this Court noted in its memorandum and order of June 30, 1982, 542 F.Supp. at 788, the Supreme Judicial Court of Massachusetts rejected defendants' claim that M.G.L. c. 176B invests in the Commissioner such absolute control over Blue Shield's operations that *any* existing Blue Shield scheme must necessarily be viewed as state policy and thus beyond the purview of

federal antitrust law. *See Kartell v. Blue Shield of Mass., Inc.,* 384 Mass. 409, 425 N.E.2d 313.

**7.** For a more detailed history of Blue Shield and its reimbursement systems, see the opinion of the Supreme Judicial Court in *Kartell,* 384 Mass. 409, 425 N.E.2d 313.

are rendered in an emergency, or are rendered outside the Commonwealth.[8]

Blue Cross, on the other hand, is authorized by statute to provide coverage to its subscribers for hospital care and related procedures. Blue Cross does not remunerate physicians for services rendered to Blue Cross subscribers except those physicians who are salaried members of the staffs of institutions, primarily hospitals, which have entered into agreements with Blue Cross.[9]

Blue Shield provides some form of health insurance to at least 3.2 million Massachusetts residents, or 56% of the population of the Commonwealth. Approximately 99% of the state's doctors in fee-for-service practice participate in Blue Shield's medical service plan.

Blue Shield was incorporated under Mass.G.L. c. 176B in May 1942. On September 18, 1942, the Commissioner of Insurance, pursuant to his powers under c. 176B, gave his approval to the first subscription contract, and to the first schedules of subscriber rates and physician fees. He also approved the initial Participating Physicians' Agreement, which remains unchanged to this day. The agreement provides in relevant part that:

> [t]he Participating Physician agrees to accept as full compensation for all ... services such payments as are received from the Corporation ... except in the case of those persons who are entitled only to Limited Indemnification, in which case the physician may make his customary charge to the patient for his services, crediting against such charge the amount set forth for such services in the fee schedule in effect at the time the services are rendered.

The original subscription certificate created two classes of subscribers. "Unlimited" subscribers, whose personal or family income was below a certain figure, received unlimited coverage from doctors in return for their premium payments. "Limited" subscribers, whose income was above a certain figure, could be balance billed by participating physicians for charges in excess of Blue Shield's allowable. This method of classification was known as "Plan A."

In 1951, Blue Shield implemented a second plan, known as "Plan B," to supplement Plan A. The new plan divided the class of "unlimited" subscribers into two subclasses based on their income levels. Blue Shield charged the higher income subscribers higher premiums and Blue Shield paid participating physicians a higher allowable for services rendered to those subscribers. Blue Shield continued to allow participating physicians to balance bill limited subscribers.

In 1956, Blue Cross and Blue Shield initiated the Master Medical Certificate, which provided comprehensive coverage of hospital and medical costs under a single plan. They continued to determine the extent of an individual subscriber's coverage according to his or her income.

In Blue Shield's first years of operation, nearly 90% of its subscribers were "unlimited" subscribers, and thus were not subject to balance billing by participating physicians. However, this percentage gradually declined during the late 1950's and 1960's, in part due to the effect of inflation on the real value of Blue Shield's fixed income limits. By 1967, fewer than 50% of Blue Shield's subscribers were still below the prescribed income levels, leaving more than half the subscribers subject to balance billing. I find that Blue Shield came under increased pressure from its subscribers to devise a new coverage that would provide full service benefits to subscribers regardless of their income levels.

---

8. As this Court held in its memorandum and order of June 30, 1982, 542 F.Supp. at 790–91, the refusal to remunerate non-participating physicians is, in and of itself, immune from antitrust challenge under the state action doctrine of *Parker v. Brown, supra.*

9. Blue Cross also reimburses those physicians who treat Massachusetts state employees who are subscribers under a Blue Cross plan available only to employees of the Commonwealth.

At the same time, a growing number of doctors were becoming dissatisfied with the reimbursement system. I find that a 1966 survey showed that "90% of the doctors in the state of Massachusetts accept the Blue Shield fee whether or not their patient is over income." However, Blue Shield payments for most services on the fee schedules had not been raised since 1952 even though doctors' charges had increased significantly in the intervening 15 years. By 1967–68, Blue Shield payments were on the average 30% below the fees usually charged by doctors.

In late 1967 or early 1968, in an attempt to respond to the rising tide of criticism from both subscribers and doctors, Blue Shield submitted to the Commissioner of Insurance a proposed "Amended Schedule of Benefits—Blue Shield Portion of the Blue Cross—Blue Shield Master Medical Certificate," which introduced the "usual and customary charge" method of compensation. The 1968 Amended Schedule of Benefits was approved by the Commissioner of Insurance effective February 1, 1968.

Under the usual and customary charge method of compensation adopted in 1968, the basic mechanics of which are still in use today, Blue Shield did not pay a predetermined, fixed amount for a service as it had under the earlier, fixed-fee system. Rather, the participating physician received from Blue Shield a payment of 95% of the lowest of (a) the doctor's submitted charge, (b) the doctor's "usual charge" (Level I), or (c) the "customary charge" for the service (Level II). Blue Shield deducts five percent to cover administrative costs. A doctor's "usual charge" for a given service is the median of the individual doctor's charges reported to Blue Shield during the applicable charge reporting period. The "customary charge" for a given service is the 90th percentile of the usual charges reported by doctors within the same specialty and geographic area during the appli-

cable charge reporting period. Under the usual and customary charge method, participating physicians were not permitted to balance bill their patients.

As originally implemented, the new system contained no limitation on year-to-year increases in the usual and customary charge levels. While participating physicians were required under this method of compensation to accept Blue Shield's fees as payment in full for covered services regardless of a subscriber's income,[10] the advantage of this system to participating physicians was the "promise of higher fees immediately for many services and relatively automatic future adjustments for inflation." *Kartell*, 384 Mass. at ——, 1981 Mass.Adv.Sh. at 1988, 425 N.E.2d 313.

From 1968 until 1975, Blue Shield updated usual and customary charges as it deemed appropriate, without objection from the Commissioner. However, in the eighteen months preceding April 30, 1976, Blue Shield's reserves plunged nearly $25 million. In an effort to contain costs and restore fiscal health to the corporation by rebuilding its reserves, Blue Shield indefinitely deferred the 1976 profile update. By March 1, 1977, the financial condition of the corporation had improved. Blue Shield then filed an amended schedule of benefits designed, according to the testimony of its President, John Larkin Thompson, to reinsure fiscal stability and to provide cost containment. The 1977 Amended Schedule of Benefits was approved by the Commissioner of Insurance and incorporated by reference in the Participating Physicians' Agreement. It provided that the percentage increase in usual and customary payments may be "limited to such amount as Blue Shield may determine" without regard to any specific formula, and that the percentage increase in "customary charges" for the applicable period may not exceed the percentage increase in the Consumer

---

**10.** When this method was first proposed in 1968, it was to be implemented only for group accounts under the Master Medical Certificate and for Blue Shield's coverage of the Federal Employee Program. At present, however, it applies to all accounts except the few remaining Plan B subscribers. Approximately 90% of Blue Shield members now have coverage which includes the ban on balance billing.

Price Index for Urban Wage Earners and Clerical Workers, Boston, All Items, less the medical care component of the Index.

Prior to July 1, 1977, the date on which the 1977 Amended Schedule of Benefits was approved, "customary" payment levels for each procedure were, in fact, calculated at the 90th percentile of all submitted charges, I find that, in each year since 1977, Blue Shield has limited the allowable percentage increase in "customary" payment levels, in most cases, to an increase less than the rise in the Consumer Price Index. As a result, the "customary" payment levels for a given procedure are now most often lower than the 90th percentile of the submitted "usual charges."

The 1977 Amended Schedule gave Blue Shield the sole authority to determine charge reporting periods used to compute updates of usual and customary charges. Blue Shield has established as its charge reporting period the calendar year preceding each annual July update. For example, the July 1, 1983, update which remains in effect until June 30, 1984, is based on charges submitted during calendar year 1982. As a result, Blue Shield bases its usual and customary payment levels on actual charges that are between 6 and 30 months old.

In each year since 1977, total payments by Blue Shield to participating physicians under the Amended Schedule have been substantially less than the total charges submitted by the doctors. For services rendered by participating physicians to Blue Shield subscribers whose coverage includes the ban on balance billing, the aggregate difference between charges submitted by doctors and Blue Shield payments was $69 million in 1979, $73 million in 1980, $81 million in 1981, $94 million in 1982, and was projected to be $103 million in 1983. The difference between submitted charges and payments, as a percentage of total doctors' charges in Massachusetts, grew from 18.4% in 1976 to 30.7% in 1981, and today remains close to the 30% figure.

I find that Blue Shield has evolved into the single most powerful actor in the various markets for health services in Massachusetts and that at the present time 99% of the practicing doctors in Massachusetts are Blue Shield participating physicians. I find, in addition, that defendant Blue Shield's 3.2 million subscribers constitute approximately 56% of the population of the Commonwealth. Some 2.5 million of those subscribers, or approximately 45% of the total population, have Blue Cross/Blue Shield coverage which is subject to the ban on balance billing.

Moreover, I find that Blue Shield has, by any measure, the dominant market share in the market for prepaid health care in the state. At trial there was voluminous and conflicting testimony as to how best to measure market share in the market for prepaid health care. The Court accepted evidence as to the market share measured by, for example, percentage of population, percentage of privately insured population, percentage of premiums paid, percentage of total health care services expenditures, and percentage of total prepaid health care expenditures. The evidence shows that, as of 1981, Blue Shield and Blue Cross provided coverage for approximately 74% of the privately-insured population in Massachusetts; only 23% of the population had coverage with commercial insurers, and less than 4% of the population was then covered by independent Health Maintenance Organizations (H.M.O.'s).

III. Analysis

The issue before the Court in this case is whether Blue Shield's ban on balance billing constitutes a restraint of trade, monopolization or an attempt to monopolize in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Section 1 of the Sherman Act of 1890 provides, in pertinent part, that

> [e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States, ... is declared to be illegal ....

15 U.S.C. § 1 (1973). Section 2 of the Act provides, in relevant part, that

> [e]very person who shall monopolize, or attempt to monopolize, or combine or

conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, ... shall be deemed guilty of a felony ....

15 U.S.C. § 2 (Supp.1983).

■ The allegedly anticompetitive effect of conduct challenged under the antitrust laws can be analyzed and evaluated properly only in the context of a well-defined market place. An antitrust plaintiff can make out a prima facie case only upon "proof of a well-defined relevant market upon which the challenged anticompetitive actions ... have had a substantial impact." *Cornwell Quality Tools Co. v. C.T.S. Co., Inc.*, 446 F.2d 825, 829 (9th Cir.1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 716, 30 L.Ed.2d 740 (1972). Accordingly, this Court must determine the product market and the geographic market in which the restraint is alleged to have occurred.

In this case, plaintiffs allege that defendants' conduct has had an illegal impact on two distinct geographic and product markets: (1) the market for physicians' services in Massachusetts, and (2) the market for prepaid health care in Massachusetts. I find that the parties are in essential agreement as to the definition of the markets at issue.

I rule that the market for physicians' services consists of doctors licensed in Massachusetts who treat patients on a fee-for-service basis. Doctors in that market provide various services, including surgery, anesthesiology, obstetrics, gynecology, neurology, radiology, internal medicine, and their numerous sub-specialties. Likewise, while some doctors attract patients from outside the state, or from across the state, and others compete in more localized areas, the parties have stipulated, and I find, that the relevant geographic market is the entire state of Massachusetts.

I rule that the market for prepaid health care includes those organizations which provide some form of health care coverage

that can be substituted for, and therefore competes with, coverage provided by Blue Cross and Blue Shield of Massachusetts.[11] I find that the relevant product market includes Blue Cross and Blue Shield, commercial insurance companies such as Aetna, Prudential and Travelers, health maintenance organizations (H.M.O.'s), administrative service only companies (ASO's), and employers who self-insure large groups of their own employees. I find, in addition, that it does not include purely governmental programs, like Medicare. I accept the opinion of Dr. Frech, plaintiffs' expert, that the government programs should be excluded from this market because no private company, including Blue Cross/Blue Shield, can effectively offer the same product as, or compete with, the government programs. Moreover, I find that the relevant geographic market for use in evaluating the effect of Blue Shield's practices is the entire state of Massachusetts.

### A. Standing

Throughout the course of this litigation defendants have contended consistently that plaintiffs, individually and collectively, lack standing to maintain this antitrust action in each of the relevant markets. Prior to trial, the parties had not developed the record sufficiently to enable the Court to rule whether plaintiffs have antitrust standing. On the basis of the evidence produced at trial, this Court can and will now make that ruling.

Plaintiffs and intervenor-plaintiffs seek injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. Section 16 defines the class of persons who may sue for relief under that section:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, ... when and under the same conditions

---

**11.** Though plaintiffs steadfastly and pointedly referred throughout the trial to this second market as the "market for private health insurance," their market definition is, in fact, substantially similar to that of defendants, whose nomenclature I now adopt.

and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity....

15 U.S.C. § 26 (1973). Read literally, the statute appears to make actionable every harm that can be attributed directly or indirectly to the consequences of an antitrust violation. Yet common sense and *stare decisis* require this Court to take a more restrictive view of standing under § 16.

> [T]he focus of the doctrine of "antitrust standing" is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907, n. 31, 74 L.Ed.2d 723 (1983).

■ Under § 16, plaintiffs must show "(1) a threatened loss or injury cognizable in equity (2) proximately resulting from the alleged antitrust violation." *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). They must also show that the "illegal act is linked to a plaintiff engaged in activities intended to be protected by the antitrust laws." *Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 731 (10th Cir.1973), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973).

Defendants challenge plaintiffs' standing to maintain an action for restraint of trade in the market for prepaid health care, relying primarily on the recent Supreme Court decision in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In that case, a carpenters' union alleged that the defendant State Council of Carpenters had restrained trade by coercing general contractors, landowners, and others engaged in construction work to contract with non-union carpenters and firms, thereby reducing the ability of certain unionized firms to compete for those contracts.[12] The Supreme Court rejected the union's claim to standing for a number of reasons which apply in this case.

The Court observed, first, that the central interest of the antitrust laws lies in "protecting the economic freedom of *participants* in the relevant market." *Id.* 459 U.S. at 538, 103 S.Ct. at 909 (emphasis added). The Court denied standing to the union in part because it "was neither a consumer nor a competitor in the market in which trade was restrained." *Id.* — U.S. at —, 103 S.Ct. at 909–911. That factor weighs heavily in this case against plaintiffs' claim to standing in the market for prepaid health care because plaintiffs are not consumers or competitors in that market. On the contrary, plaintiffs are contractually involved with defendants only in an altogether different market, the market for physicians' services.

Another factor militates against a finding that plaintiffs have standing in the market for prepaid health care. In *Associated General Contractors* the Supreme Court observed that

> [t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general. Denying the Union a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied.

*Id.* 459 U.S. at 542, 103 S.Ct. at 911. That reasoning applies squarely in this case. I find that the private insurance companies which compete in Massachusetts

---

**12.** *Associated General Contractors* was an action for damages brought under § 4 of the Clayton Act, 15 U.S.C. § 15. However, the majority of the policy considerations enumerated by the Court are relevant to the present analysis of standing for injunctive relief.

in the health care market and whose representatives appeared as witnesses at the trial constitute an identifiable class of persons whose self-interest would obviously motivate them to sue if the alleged violation were to exist in the market for prepaid health care. Moreover, a ruling that denies plaintiffs standing to maintain an action in the market for prepaid health care does not in any way leave a "signficant antitrust violation undetected or unremedied." If this Court finds that defendants' conduct in the market for physicians' services violates antitrust laws, plaintiffs will obtain the same relief that they seek for alleged violations in the market for prepaid health care.

Plaintiffs also rely on the 1982 decision of the Supreme Court in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), to establish their standing to complain of a restraint in the market for prepaid health care. Plaintiffs' reliance on *McCready* is misplaced because of the substantial factual differences between *McCready* and this case. McCready alleged that she was a consumer of psychotherapeutic services and that she had been injured by defendant Blue Shield's conspiracy to restrain competition in the market for such services.[13] Plaintiffs in this case are not consumers in the market for prepaid health care, nor do they sell services in that market. Moreover, the Court in *McCready* noted specifically that while McCready had standing to maintain an action as a consumer in the market for *psychotherapeutic services,* she did not "allege a restraint in the market for *group health plans." Id.* 457 U.S. at 480, 102 S.Ct. 2549 (emphasis added).

■■■ Since the plaintiff physicians in this case participate only as vendors in the *market for physicians' services,* they can only sustain a legally cognizable injury in that market, and can only challenge the ban on balance billing as a restraint in that market. Even if defendants have used ill-

gotten power in the market for prepaid health care as the primary weapon to inflict injury upon plaintiffs as functioning actors in the *market for physicians' services,* that fact does not bestow upon plaintiffs standing to allege a restraint in the market for prepaid health care.

■■■ Defendants also argue that plaintiffs lack standing to allege an antitrust violation in the market for physicians' services. The Sherman Act protects the economic freedom of *participants* in the markets where they compete. *See United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). The doctors sell their services in the market for physicians' services. As vendors in the market for physicians' services, they have standing to challenge a restraint of trade in that market. Moreover, the participating physicians also allege that Blue Shield's compensation scheme distorts the market place and has wide-ranging detrimental effects on doctors' freedom and ability to innovate and to engage in non-price competition. Those injuries are certainly "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *McCready,* 457 U.S. at 483, 102 S.Ct. at 2550–51.

Those doctors who have chosen not to sign Participating Physicians' Agreements with Blue Shield have also alleged a legally cognizable antitrust injury. They claim that their refusal to sign the participation agreement effectively precludes them from attracting a large percentage of the state's population as patients. Such a curtailment of competition in the market and refusal to deal would constitute a cognizable antitrust injury. Non-participating doctors are not precluded from bringing suit to restrain the ban on balance billing simply because they refuse to join in the alleged antitrust conspiracy.

---

**13.** McCready, a Blue Shield subscriber, alleged that Blue Shield and the Neuropsychiatric Society of Virginia, Inc. had unlawfully conspired to restrain competition in the market for psychotherapeutic services by providing insurance coverage only for consumers who patronized psychiatrists, not psychologists. McCready had obtained services from a psychologist and had been denied reimbursement.

### B. Plaintiffs' Section 1 Claims

Section 1 of the Sherman Act literally prohibits every contract, combination or conspiracy in restraint of trade. But over the years, courts have read § 1 to prohibit not *every* contract in restraint of trade, but only *unreasonable* restraints of trade. *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). This Court has already ruled that the provider agreements between Blue Shield and participating doctors do not constitute *per se* price-fixing but should be judged under the rule of reason.[14] *Kartell v. Blue Shield of Massachusetts,* 542 F.Supp. at 794. Other courts have almost uniformly applied the rule of reason analysis to similar agreements.[15] *See, e.g., Sausalito Pharmacy, Inc. v. Blue Shield of California,* 544 F.Supp. 230 (N.D.Cal.1981), *aff'd per curiam,* 677 F.2d 47 (9th Cir.1982); *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.,* 675 F.2d 502 (2d Cir.1982); *Glen Eden Hospital, Inc. v. Blue Cross & Blue Shield of Michigan,* 555 F.Supp. 337 (E.D.Mich.1983); *Blue Cross & Blue Shield of Michigan v. Michigan Association of Psychotherapy Clinics,* 1980–2 Trade Cas. (CCH) ¶ 63,351 (E.D. Mich.1980).

■ Justice Brandeis provided the classic statement of the rule of reason in *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918):

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

The rule of reason requires the fact finder to decide whether under all the circumstances of the case the restrictive practice imposes an *unreasonable* restraint on competition. A restraint is unreasonable if it has the net effect of substantially impeding competition. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 687–92, 98 S.Ct. 1355, 1363–65, 55 L.Ed.2d 637 (1978).

Defendants contend that the special characteristics of the physicians' services market make it inappropriate for the Court to apply traditional antitrust analysis to the vertical arrangements between Blue Shield and the individual physicians.

---

**14.** Plaintiffs also allege that Blue Shield and Blue Cross have engaged in a horizontal restraint of trade by their joint medical care certificate and their other marketing agreements and joint administration. M.G.L. c. 176A, § 5 and c. 176B, § 3 expressly authorize Blue Cross and Blue Shield to contract with each other "for the joint administration of their business and for joint and co-operative writing and issuing of certificates." Because any such agreement between Blue Cross and Blue Shield is likely exempt from antitrust scrutiny by virtue of the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq., see, e.g., Quality Auto Body, Inc. v. Allstate Insurance Co.,* 660 F.2d 1195, 2000–01 (7th Cir. 1981), and by virtue of the state action exemption, *see Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), I analyze only the

**15.** In *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the Supreme Court found a similar, but distinguishable, insurance scheme to be a *per se* violation and went on to note that "this case [does not] present the question whether an insurer may, consistent with the Sherman Act, fix the fee schedule and enter into bilateral contracts with individual doctors. That question was not reached in *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979)." *Id.* 457 U.S. at 353 n. 26, 102 S.Ct. at 2477–78 n. 26.

746

ban on balance billing. The fact that the market for physicians' services bears little likeness to the econometric models of "pure competition" does not exempt it from antitrust scrutiny. As the Supreme Court reiterated in *Professional Engineers:*

> The early cases ... foreclose the argument that because of the special characteristics of a particular industry, monopolistic arrangements will better promote trade and commerce than competition. [Citation omitted]. That kind of argument is properly addressed to Congress and may justify an exemption from the statute for specific industries, but it is not permitted by the Rule of Reason.

*Id.* 435 U.S. at 689–90, 98 S.Ct. at 1364. Congress has not chosen to exempt the health care industry from the purview of antitrust litigation, and the Supreme Court has been reluctant to create any such exemption. Congress has recently made the *"strengthening of competitive forces* in the health services industry" a matter of national priority and has directed that special consideration be given throughout the planning process to the importance of maintaining and improving competition in the health industry. National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 300k–2(a)(17) (1982) (emphasis added). Moreover, in *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the Supreme Court specifically refused to create such a judicial exemption for the physicians' services market. *See id.* 457 U.S. at 354–55, 102 S.Ct. at 2478–79.

Defendants argue that the ban on balance billing should not be subject to traditional rule of reason analysis for another reason. They claim that the ban on balance billing makes it possible for Blue Cross and Blue Shield to satisfy the strong and otherwise unsated consumer demand for low-cost, comprehensive coverage. It enables Blue Cross and Blue Shield, they argue, to hold down increases in medical costs and, in that way, to minimize increases in subscriber premiums. I rule that, in essence, this is the same argument the Supreme Court rejected summarily in *Mar-*

*icopa.* The Court of Appeals in that case had upheld the challenged restraint because it served as an effective cost-containment mechanism saving patients and insurers millions of dollars, and because it had facilitated the successful marketing of an attractive insurance plan. *See Arizona v. Maricopa County Medical Society,* 643 F.2d 553 (9th Cir.1980). The Supreme Court rejected that reasoning and found a § 1 violation, calling the test the Court of Appeals had applied "a legal standard based on the reasonableness of the fixed prices, an inquiry [the Supreme Court has] so often condemned." 457 U.S. at 350, 102 S.Ct. at 2476. Even though a challenged restraint may benefit consumers in the short term, anticompetitive restraints inevitably lessen consumer welfare in the long term. As this Court recently observed in another antitrust case:

> In our economy, ... prices are set by the impersonal forces of competition, and not by consumer preference. Furthermore the law protects the impersonal forces of competition, rather than consumer preference, on the basis that economic forces will ultimately enhance consumer welfare.

*M & H Tire Co., Inc. v. Hoosier Racing Tire Corp.,* 560 F.Supp. 591, 606 (D.Mass. 1983).

I turn now to the very heart of the controversy before this Court: whether the ban on balance billing has the net effect of *promoting* or *suppressing competition* in the market for physicians' services in Massachusetts. It is defendants' contention not only that plaintiffs have failed to demonstrate any significant harm to competition arising from the ban, but also that the ban has, in fact, numerous procompetitive effects.

Defendants argue that the ban on balance billing *promotes* competition in the market for physicians' services in three ways. First, they contend that, because Blue Cross and Blue Shield provide the inexpensive comprehensive health care coverage which the public demands, they act

as entrepreneurial competitors, enhancing, not undermining, the competitive process. But I rule that even if their alleged entrepreneurial activity enhances competition, it does so only in the market for prepaid health care. It does not enhance competition in the market for physicians' services.

Second, defendants argue that the ban on balance billing promotes competition because it protects subscribers from unrestrained pricing by physicians. Lower prices, in and of themselves, do not necessarily represent enhanced competition, because they can just as easily result from an illegal restraint. Furthermore, as noted above, the fact that "reasonable" fees result from the restraint does not justify an otherwise unlawful restraint of trade. I rule, therefore, that that claim is without legal merit.

Third, defendants argued through the testimony of their expert witness that the ban on balance billing promotes competition because it has produced a pricing structure similar to the pricing structure one would expect to find in a market where price competition is widespread. But defendants' expert witness, Dr. Dyckman, conceded that, although he believed that prices now charged by physicians are higher than they should be, he had no idea what a reasonable competitive price would be for any of the thousands of procedures listed in defendants' Basic Benefit Schedule, all of which are subject to the ban. Moreover, I observe once again that, even if reasonable competitive prices could be determined by an individual, by Blue Shield, or by this Court, the reasonableness of a pricing structure engendered by an otherwise unlawful restraint does not justify the restraint.

Finally, it would be inequitable to allow defendants to justify the ban on balance billing as necessary to counter uncompetitively high prices in the market place when defendants themselves caused much of the price inflation in that market through their usual and customary charge method. I find that the usual and customary charge method as originally enacted discouraged participating physicians from reducing prices, or from modifying their fees to reflect actual time and effort expended on a particular patient. If a doctor were to lower prices to some patients, he would lower his "usual charge" profile, thereby reducing the amount Blue Shield would reimburse him in the future. The methodology gave doctors an artificial incentive to develop unrealistically high charges, in recognition of the fact that their next Level I "usual" profile updates would reflect their higher fees. Defendants acknowledge that Blue Shield adopted the Amended Schedule of Benefits in 1977, with its cap on usual and customary profile updates, in order to break the inflationary spiral of medical costs caused in part by the usual and customary charge method.

To allow defendants unilaterally to impose a "reasonable" price structure in order to counteract high prices which they themselves fostered would surpass the bounds of reason and be abominably bad antitrust law. I find, therefore, that even if it is assumed that the ban on balance billing has some beneficial effects in other areas, it does not *promote competition.*

Defendants also contend that, even if the ban on balance billing constitutes a restraint of trade, it is not an *unlawful* restraint. They rely on the decisions in two recent cases involving similar Blue Cross and Blue Shield provider agreements, *Sausalito Pharmacy, Inc. v. Blue Shield of California,* 544 F.Supp. 230 (N.D.Cal. 1981), *aff'd per curiam,* 677 F.2d 47 (9th Cir.1982), and *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.,* 675 F.2d 502 (2d Cir.1982). The Courts in *Sausalito* and *Medical Arts* ruled that contracts between Blue Shield and participating pharmacies do not restrain trade impermissibly unless there is some effect on price formation, or on competitive conduct or conditions, that is independent of what the terms of the contract require. The allegedly illegal restraint in those cases—agreements between sellers and buyers setting a price for fungible goods—was the same "price-fix-

ing" that accompanies every contract. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 5, 99 S.Ct. 1551, 1554, 60 L.Ed.2d 1 (1979). It is defendants' contention that the allegedly anticompetitive effects of the ban on balance billing are directly analogous to the alleged effects which were held not to rise to the level of a Sherman Act violation in both *Sausalito* and *Medical Arts*. However, those cases are legally and factually distinguishable from the case at bar.[16]

In both *Sausalito* and *Medical Arts*, plaintiffs challenged the provider agreements solely on the ground that the agreements constituted a price-fixing conspiracy, and were thus *per se* violations of § 1. The courts did not scrutinize the agreements under the rule of reason standard. The plaintiffs in those cases had not alleged, nor had they presented evidence to show, that the agreements had an extra-contractual effect on prices or competition. Because the provider agreements in those cases did not constitute *per se* price-fixing violations, the courts granted summary judgment for the defendants and did not consider whether the agreements violated the rule of reason. Plaintiffs in this case have not only alleged anticompetitive effects that reach beyond the price terms of the provider agreements, but they have presented voluminous evidence in support of their claims.

Moreover, the plaintiff pharmacies in *Sausalito* and *Medical Arts* complained, in effect, simply about the unfavorable terms of contracts into which they had entered

*voluntarily.* In *Medical Arts*, the district court found specifically that, while the terms of the provider contract were determined unilaterally by Blue Cross, the individual pharmacies did have a meaningful economic choice as to whether or not to sign the contracts.[17] In fact, only 9% of the Connecticut population was eligible for Blue Cross prescription drug benefits, and sales to Blue Cross members amounted to only 9% of the statewide sales volume. 518 F.Supp. 1100, 1103 (D.Conn.1981). Nothing in the opinion of either the district court or the court of appeals implies that the case would have lent itself to disposition on summary judgment if plaintiffs had been able to show that they were the victims of economic coercion rather than of their own business (mis)judgment. *See Medical Arts*, 675 F.2d at 507; 518 F.Supp. at 1108 n. 9.

The facts in this case are substantially different. The testimony at trial establishes, and I find, that under the current Blue Shield payment system, which incorporates the ban on balance billing, Massachusetts physicians have absolutely no meaningful economic choice except to agree to the pricing terms unilaterally established by defendants.[18] Physician participation is not voluntary in any sense of the word, but is, rather, a matter of economic necessity. I find that the fact that over 99% of the state's practicing doctors have signed the participation agreement, and continue to acquiesce in the increasingly restrictive and unfavorable pricing system, proves Blue

---

**16.** In *Sausalito* and *Medical Arts,* plaintiff pharmacies unsuccessfully challenged provider agreements between themselves and Blue Cross. The agreements between Blue Cross and participating pharmacies established the maximum prices which pharmacies could recover for prescription drugs supplied to Blue Cross subscribers. Under the reimbursement plan examined by the court in *Medical Arts,* which is substantially similar to the provider agreement at issue in *Sausalito,* Blue Cross subscribers who patronized "participating" pharmacies (*i.e.,* those who had entered into agreements with Blue Cross) were required at most to pay the pharmacy a small "deductible" amount, and the pharmacy was reimbursed by Blue Cross at the rate established in the agreement. Subscribers who pa-

tronized non-participating pharmacies paid the pharmacies the over-the-counter prices for prescriptions, and were reimbursed by Blue Cross at the rate established in the subscriber agreement with Blue Cross.

**17.** The district court's opinion appears at 518 F.Supp. 1100 (D.Conn.1981).

**18.** Plaintiffs acknowledge that defendants, and any *other* health insurers, are entitled to limit what *they* pay to physicians for medical services rendered to subscribers. Plaintiffs only contest an insurer's right to limit the *total amount* a physician can receive for medical services rendered.

Shield's economic power, and also proves that there is very heavy economic pressure on doctors to participate.

I find that because nearly 60% of all Massachusetts residents subscribe to Blue Cross/Blue Shield, doctors in Massachusetts *must* accept defendants' pricing terms in order to maintain a viable practice in the state. A physician who refuses to participate in the Blue Cross/Blue Shield plan is effectively foreclosed from treating almost two-thirds of the state's residents as patients. By contrast, the Blue Cross plan in *Medical Arts* provided that subscribers would be partially remunerated even for prescriptions filled by non-participating pharmacists. In that way, non-participating pharmacies were not foreclosed completely from dealing with Blue Cross subscribers. Consequently, they had an economically viable, though less lucrative, alternative to participation.

Moreover, while there was conflicting testimony in this case as to the percentage of physician income contingent upon Blue Shield participation, it is clear that a doctor in Massachusetts, when deciding whether or not to sign the participation agreement, must consider factors other than simply the 13–14% of physician practice revenue paid by Blue Shield which is directly derived from services subject to the ban. When Blue Shield payments for services *not* covered by the ban are added in, Blue Shield payments constitute approximately 20% of total physician income. Moreover, I find that participating physicians derive a substantial percentage of their income from out-of-pocket payments by Blue Shield subscribers for non-covered services and from non-subscribers referred to them by other participating physicians. These sources of income are inevitably foreclosed if the doctor decides *not* to sign the participation contract.

In short, I find that Blue Shield "delivers" a much larger percentage of total physician income than the amount of its own payments and I find that its enormous leverage over physicians derives from the amount of physician income it controls.

Drs. Brown, Wilson, Yerkes, Sloss, Rodkey and Kartell testified that it is economically impossible for a non-participating physician to maintain a viable practice in Massachusetts and I so find. In light of that testimony and the particular circumstances of this case, it would be contrary to fact and legally untenable for this Court to find that plaintiffs have *voluntarily* signed the participation agreements, and to rule that they are, therefore, precluded from challenging the allegedly anticompetitive restraint which the contract terms produce.

For the reasons set forth above, I decline to follow the ruling of the courts in *Medical Arts* and *Sausalito*. Yet, the burden of proof set out in those cases remains relevant to this case: plaintiffs must establish that the ban on balance billing has an "effect on price formation, or other type of restraint of trade, independent of what the contract terms ... require." *Sausalito,* 544 F.Supp. at 235, *quoting Blue Cross & Blue Shield of Michigan v. Michigan Association of Psychotherapy Clinics,* 1980–2 Trade Cas. (CCH) ¶ 63,351 at 75,795 (E.D.Mich.1980).

In their effort to establish that Blue Shield's current reimbursement system has had, and continues to have, a substantial anticompetitive effect on the market for physicians' services, plaintiffs rely heavily on the 1982 Supreme Court decision in *Arizona v. Maricopa County Medical Society, supra.*[19] This Court is well aware that there are major differences between the Blue Shield system incorporating the ban on balance billing that is under consideration in this case and the insurance plan which the Supreme Court found to be *per se* violative of the Sherman Act in *Maricopa.* Nevertheless, I rule that the legal and economic principles underlying the decision

---

**19.** This Court considers itself bound by the decision in *Maricopa,* but notes that Justices O'Connor and Blackmun recused themselves and that Chief Justice Burger and Justices Powell and Rehnquist dissented. How the Supreme Court would rule on this same issue in the next case to come before it is anyone's guess.

in *Maricopa* may be appropriately applied to the controversy now before this Court.

In *Maricopa*, the Supreme Court examined a maximum fee arrangement that was substantially similar to the Blue Shield system which plaintiffs now challenge. The defendant in that case, the Maricopa County Medical Society, established the Maricopa Foundation for Medical Care, a non-profit corporation composed of approximately 70% of the doctors engaged in private practice in Maricopa County, Arizona. The foundation, by agreement of its member doctors, established a schedule of maximum fees that participating doctors agreed to accept as payment in full for services performed for patients insured under plans approved by the foundation. A patient who was insured by a foundation-endorsed plan was guaranteed complete coverage if he or she was treated by a foundation member; if the doctor's bill exceeded the foundation's maximum fee, the foundation disallowed the excess pursuant to the doctor's membership agreement.[20] The patient was free to go to a nonmember physician and was covered for charges that did not exceed the fee schedule. He was, however, liable for any amount in excess of the foundation payment. Participating doctors were free to charge higher fees to uninsured patients than they charged to insured patients and they were also permitted to charge any patient less than the

scheduled maximum. Seven insurance companies, representing a maximum of 63% of the prepaid health care market, underwrote health plans approved by the foundation. 457 U.S. at 341 n. 11, 102 S.Ct. at 2471 n. 11.

Certainly, the most significant difference between the plan struck down in *Maricopa* and the Blue Shield plan currently under challenge in this case is that the maximum price levels in *Maricopa* were fixed by the doctors themselves, rather than by a medical service corporation like Blue Shield. The restraint in *Maricopa* was thus a classic example of a horizontal maximum price-fixing agreement between competitors. Accordingly, the Supreme Court struck down the agreement under the *per se* rule against price-fixing. *Id.* 457 U.S. at 348, 102 S.Ct. at 2475.

■ The mere fact that the Blue Shield plan in this case does not constitute *per se* horizontal price-fixing does not make its adverse impact on competition any less objectionable than the plan struck down by the Supreme Court in *Maricopa*.[21] The determinative factor in any § 1 analysis is the impact, or the probable impact, of a restraint on competition, not the means employed to effect that impact.

When the Supreme Court reversed the Court of Appeals for the Ninth Circuit in

**20.** The physicians' agreement in *Maricopa* provided in part that the physician agreed "to be bound ... with respect to maximum fees ... by any fee determination by the [f]oundation consistent with the schedule adopted by the [foundation physician] membership ...." The agreement also provided that foundation members "understand and agree that participating membership in the [f]oundation shall not affect the method of computation or amount of fees billed by [the physician] with respect to any medical care for any patient." 457 U.S. at 359, 102 S.Ct. at 2481 (Powell, J., dissenting).

**21.** In *Maricopa*, the Court reflected on the procedural aspects of the creation of a fee schedule, and noted that an insurer, such as Blue Shield, is itself capable of creating a fee schedule through altogether different means:

In order to create an insurance plan under which the doctor would agree to accept as full payment a fee prescribed in a fixed schedule,

someone must canvass the doctors to determine what maximum prices would be high enough to attract sufficient numbers of individual doctors to sign up but low enough to make the insurance plan competitive. In this case that canvassing function is performed by the foundation; the foundation then deals with the insurer. It would seem that an insurer could simply bypass the foundation by performing the canvassing function and dealing with the doctors itself. Under the foundation plan, each doctor must look at the maximum-fee schedule fixed by his competitors and vote for or against approval of the plan (and, if the plan is approved by majority vote, he must continue or revoke his foundation membership). A similar, if to some extent more protracted, process would occur if it were each insurer that offered the maximum-fee schedule to each doctor. *Id.* [457 U.S.] at 353–4 n. 28, [102 S.Ct. at 2478 n. 28].

*Maricopa* and ruled that the maximum fee arrangements, as price-fixing agreements, were *per se* unlawful under § 1 of the Sherman Act, the Court was concerned primarily with the restraint's anticompetitive impact on the market for physicians' services and the resultant long-term negative effect on the quality and availability of health care. Justice Stevens, writing for the Court, observed:

> In this case the rule is violated by a price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases. Such a restraint also may discourage entry into the market and may deter experimentation and new developments by individual entrepreneurs. It may be a masquerade for an agreement to fix uniform prices, or it may in the future take on that character. 457 U.S. at 348, [102 S.Ct. at 2475].

Indeed, many of these anticompetitive effects have materialized in the present case. As the Blue Shield methodology has evolved away from the unrestricted usual and customary charge method incorporating the ban, the restrictive effect of the ban on balance billing has become more pronounced. I find that the evidence establishes that over the last six years, since the adoption of the Amended Schedule of Benefits, defendants have limited the annual percentage increases in the "customary" (or Level II) charges, with the result that the usual and customary charge methodology has taken on many of the functional attributes of a fee schedule system.[22] The percentage of claims paid at the "customary" level (Level II) fixed by Blue Shield, rather than at either the "usual charge" level (Level I), or the submitted charge level, has increased significantly. In fiscal year 1980, approximately 35% of all claims for services were paid at Level II rates; in 1981 that percentage increased to nearly 40%, and in fiscal year 1982, approximately 46% of all claims were paid at the "customary" level as adjusted by Blue Shield. Thus I find that, in effect, Blue Shield has converted its usual and customary charge methodology into a fee schedule system with all of the operational characteristics and competitive effects associated with such a system.

As the Supreme Court predicted in *Maricopa*, those doctors in Massachusetts wanting to compete by offering innovative or "premium" services—services requiring more of the doctors' time and expense—are discouraged from doing so because defendants' pricing structure presumes that doctors' services are fungible. Defendant Blue Shield pays all doctors at the same "customary" maximum price level regardless of their levels of skill, their experience, their levels of training, their willingness to employ new procedures, or the levels of care they provide. Thus, the Blue Shield maximum fee system permits no financial reward for excellence, nor does it provide an incentive for individual qualitative improvement or innovation.

Dr. Frech testified that the Blue Shield system makes a physician's total income dependent almost entirely on volume—the number of procedures performed—rather than on the time and effort expended in the care of a particular patient. Dr. Frech's observation is corroborated by the experience of Dr. Henry Brown, a Massachusetts physician who is one of the plaintiffs in this case. Dr. Brown's experience provides an example of how the Blue Shield system produces the harmful effects envisioned by the Supreme Court in *Maricopa*.

I find that Dr. Brown is a surgeon who has been associated with the Harvard Surgical Services at Boston City Hospital since 1963, and is the head of the Hand Teaching Service at Harvard. Dr. Brown became a Blue Shield participating physician in 1963, and remained one until 1978 when he resigned rather than bow to the above-men-

---

**22.** Internal Blue Shield memoranda show that the purpose of the compression of the Level I and Level II fees is to produce a fee schedule for Blue Shield payments. *See, e.g.,* Plaintiffs' Exhibit 45.

tioned pressures to increase his patient load and compromise the quality of care provided. Following his resignation, Dr. Brown found that he was unable to maintain a viable practice in Massachusetts: when prospective patients learned that Blue Shield would neither pay Dr. Brown directly, since he was no longer a participating physician, nor reimburse the patients directly for services rendered by him, "the great majority of them felt that they had paid their premiums, and [they] would go to another physician." Thus, following his resignation from Blue Shield, Dr. Brown determined that to survive economically he had to shift the emphasis of his practice to out-of-state patients.

I find that Dr. Brown now maintains a small private practice in Massachusetts, while serving as Chief of the Hand Clinic and Director of Rehabilitation Medicine at the Veterans Administration Hospital in Manchester, New Hampshire, and that, at the present time, only 20% of Dr. Brown's income is derived from services provided to Massachusetts residents on a fee-for-service basis. I find that not only has Dr. Brown's freedom to compete in the market for physicians' services in Massachusetts been adversely affected, but also that his services are less available to Massachusetts residents, subscribers and non-subscribers alike, as a direct result of the Blue Shield plan.

Similarly, as the Court in *Maricopa* predicted, the ban on balance billing has had the effect of discouraging innovation, and of discouraging the development and application of new medical procedures in Massachusetts. The testimony of Dr. Stephen Hedburg illustrates how the Blue Shield plan discourages both innovations in, and the widespread adoption of, new medical techniques. Dr. Hedburg is a Blue Shield participating physician, specializing in sur-

gery and clinical endoscopy at Massachusetts General Hospital. In addition, he serves as a clinical professor of surgery at Harvard Medical School. Dr. Hedburg testified that in the early 1970's he was one of the first doctors in the country, and the first doctor in Massachusetts, to perform a new procedure known as "colonoscopy with polypectomy." [23] I find that this outpatient procedure had a significantly lower cost, required much less in-hospital time, and involved much less risk to the patient, than the traditional surgical alternative which requires lengthy hospitalization and a much greater out-of-pocket expense.[24]

In 1974, when Dr. Hedburg's average charge for the colonoscopy with polypectomy was $500, the average Blue Shield reimbursement for the procedure was $170. At the same time, Dr. Hedburg received for the identical procedure an average of $175 from Medicare, $245 from Medicare with complimentary, and $425 from other sources. The gap has since narrowed. Dr. Hedburg currently charges around $800 and Blue Shield pays close to $700. The out-of-pocket cost for the traditional surgical alternative is now approximately $6,000.

It is axiomatic that neither Dr. Hedburg nor any other doctor has an inalienable right to receive his asking price for this procedure, or for any other procedure, nor do the antitrust laws protect any particular level of doctor compensation. However, the antitrust laws are intended to preserve and foster incentives to compete and to innovate. Blue Shield's reluctance to provide full remuneration for innovative procedures, coupled with its ban on balance billing, discourages physicians from undertaking the training and purchasing the equipment necessary to learn and offer the safer, innovative, relatively inexpensive proce-

23. A colonoscopy is a form of endoscopy in which the interior of the colon is examined using a colonoscope, a flexible fiberoptic instrument approximately six feet in length, which is introduced into the colon. The endoscopist is able to examine the lining of the colon in great detail and is capable of using the same instru-ment to perform biopsies and other surgical procedures within the colon. The removal of a benign tumor is called a polypectomy.

24. The true economic cost of the procedure also includes wages foregone by a patient during the longer hospitalization and recovery.

dure.[25] As a result, doctors in Massachusetts have been reluctant to learn the new colonoscopy with polypectomy procedure. It is likely that, for those persons contemplating surgery in the early 1970's, including both Blue Shield members and non-members, the new procedure, with its many advantages, was a less available and less attractive medical alternative than it might have been had competitive market forces not been restrained.

While the parties have stipulated that the ban on balance billing has had no impact on *average* physician practice income, I find that the Blue Shield payment scheme "tends to provide the same economic rewards to all practitioners regardless of their skill, their experience, [or] their training," *Maricopa*, 457 U.S. at 348, 102 S.Ct. at 2475, and I find that the result of such a plan is that, in Massachusetts, superior physicians are undercompensated and below-average physicians are overcompensated.

Moreover, Blue Shield deters above-average or experienced doctors from entering the market for physicians' services in Massachusetts through its policy regarding compensation of "new" doctors. No matter how many years an experienced doctor has been in practice in a state outside of Massachusetts, and no matter how high the doctor's level of skill and experience, the maximum amount Blue Shield will pay any doctor in his first year of practice in Massachusetts is limited to the 50th percentile of the "customary charges" for that procedure. Massachusetts may in fact be insulated from the immediate effects of such a disincentive, for many superior doctors are no doubt willing to forego some financial rewards in order to practice in the Boston area with its high caliber medical personnel, and its world-renowned teaching hospitals and facilities. Nevertheless, I find that, while there has not been a decrease in the total number of doctors practicing in the Commonwealth, the Blue Shield plan as it presently exists tends to make Massachusetts a less attractive place to practice medicine than it would be absent the ban on balance billing.

Plaintiffs contend, but failed to prove, that the current Blue Shield payment plan has caused an exodus of practicing physicians from Massachusetts. Data received in evidence from the American Medical Association, from Blue Shield, and from the Massachusetts Medical Society, a plaintiff in this case, show, and I find, that there has not been a substantial migration of physicians out of Massachusetts. Rather, I find that the number of practicing physicians in Massachusetts has increased steadily during the past decade.

The policy considerations which the Supreme Court found to be persuasive in *Maricopa* are even more compelling on the markedly different factual record of this case. The Supreme Court in *Maricopa*, even while recognizing the voluntary and non-binding nature of the physicians' participation in the foundation, held that the plan had a disturbing tendency to stifle medical innovation and to deter the investment of extra time and money on the part of physicians, to the ultimate detriment of quality health care. Those same policy concerns can only be heightened in this case by the fact that physician participation in the Blue Shield plan is not, in fact, voluntary. I find that resignation is not a viable alternative for Massachusetts physicians who believe that the Blue Shield Participating Physicians' Agreement inhibits

---

**25.** Defendants claim that the low initial level of payment by Blue Shield was due to an insufficiency of fee data and to incorrect filings by physicians. Further, they argue that the initial interim fee established by Blue Shield's fee committee, though perhaps too low, was nonetheless reasonable. Both of these arguments miss the point. The crucial point in plaintiffs' argument is not that Blue Shield's fee determination was ultimately unreasonable (though it may have been), but that the low initial fee, in conjunction with the ban, in fact deterred physician adoption of the new procedure. Precisely because a low fee determination by Blue Shield, even if made in good faith, can have these deleterious effects, it is especially important that during the early, formative development of a medical technique, the market, not Blue Shield, should determine the relative value of a procedure.

their offering innovative or more time-consuming health care.

Another important difference between the two cases is that in *Maricopa* the Supreme Court was concerned with the economic effects of a plan covering *70%* of the practicing physicians in *one county* in Arizona. In this case, participation is statewide and the restraint is thus more pervasive. Over 99% of the practicing physicians in the Commonwealth are bound by the price restrictions promulgated by Blue Shield. If a prospective patient living in Maricopa County, Arizona had been dissatisfied with the level or quality of care provided by the 70% of the doctors in the county who were members of the foundation, he was able either to turn to one of the 30% of the doctors in Maricopa County who were not members of the foundation or to a doctor in another county. A similarly dissatisfied prospective patient in Massachusetts must look to a doctor in another state, an unlikely eventuality, or turn to one of the very few non-participating physicians in Massachusetts. Thus, the impact of the illegal restraint in *Maricopa* was much more limited than the impact which is generated by the Blue Shield plan now under attack, both in terms of the adverse impact on patients' choice of doctor and the effect on competition among doctors in general.

Defendants seek to counter plaintiffs' reliance on *Maricopa* with two arguments. First, they argue that the Blue Shield plan, incorporating the ban on balance billing, has no anticompetitive effect on competition in the physicians' services market because doctors remain free to charge any fee that they wish. On this record, however, that argument is misleading and factually incorrect. Certainly, doctors remain able to announce any fee level they choose. But for services rendered to a majority of the state's population the ban on balance billing prevents them from collecting more than the amount Blue Shield is willing to pay on behalf of its subscribers. The economic freedom protected by the Sherman Act is not the meaningless freedom simply to ask for any particular fee, but rather the fundamental freedom to bargain for, and to receive, a market-determined price for services rendered.

Moreover, defendants' argument rests on the notion that Blue Shield does not set physicians' fees, but merely establishes the levels at which it will pay doctors for services rendered to its subscribers. That distinction was implicitly rejected by the Supreme Court in *Maricopa.* In that case, participating doctors agreed to a schedule of maximum fees which they would accept as payment in full for health services provided to certain policyholders, although they specifically retained the "right" to charge a patient any fee of their choosing.[26] Despite the explicit contractual disclaimer stating that the agreement did not restrict the pricing freedom of any of the foundation's member doctors, the Supreme Court characterized the maximum fee arrangement as one which regulated *prices* and price competition.

Second, defendants argue that because Blue Shield's payments subject to the ban on balance billing constitute only 13–35% of total physician revenue, Blue Shield's payments affect too small a proportion of total physician revenue to enable it to exert control over prices in the market for physicians' services. It is not, however, plaintiffs' burden to establish that Blue Shield has *absolute* control over pricing in the market for physicians' services. Instead, plaintiffs allege, and I rule that they have in fact proved, that Blue Shield's current system tends to distort, eliminate, and impede price competition among physicians. The Supreme Court has long held that inability to *control* prices does not save an otherwise illegal scheme.

Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized

---

**26.** See Footnote Number 20, *supra,* for the exact wording of the contract.

prices they would be directly interfering with the free play of market forces. *United States v. Socony-Vacuum Oil Co., Inc.,* 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940). Since I find that defendants' usual and customary charge method, as applied together with the ban on balance billing, has the effect of fixing prices in the market for physicians' services and of otherwise interfering with the free play of market forces, I rule that it violates § 1 of the Sherman Act. The testimony at trial establishes, and I find, that Blue Shield plans which incorporate the ban on balance billing substantially reduce the level of price competition in the market for physicians' services in Massachusetts.

■■■ In summary, I rule that defendants' ban on balance billing imposes an unreasonable restraint on competition in the market for physicians' services in Massachusetts. I find that the restraint has a deleterious effect on competition in that market far exceeding the mere diminution in doctors' earnings that results directly from the terms of the Participating Physicians' Agreement. I find further that this effect is not offset by any demonstrable procompetitive effect. The ban interferes substantially with doctors' basic freedom and ability to compete—to offer a variety of medical services to the public in return for a price determined by market forces. As predicted by the Supreme court in *Maricopa,* the restraint has had, and continues to have, the effect of discouraging innovation and of discouraging the adoption of new medical techniques. In addition, I find that the ban reduces the quality of medical care in Massachusetts because it suppresses the normal market-generated incentives for physicians to improve and refine their services. For these reasons, I rule that the ban on balance billing unreasonably restrains trade in the market for physicians' services in Massachusetts in violation of Section 1 of the Sherman Act and that its further implementation should be enjoined.

C. Plaintiffs' Section 2 Claims

■■■ In light of this Court's disposition of plaintiffs' claim under § 1 of the Sher-

man Act, and further, because plaintiffs pray for identical relief under § 2 of the Act, I do not believe a lengthy analysis of the merits of the remaining Section 2 claim is warranted. Succinctly stated, I find plaintiffs have not sustained their burden of proving that Blue Shield has monopolized the market for physicians' services in Massachusetts.

Order accordingly.

### ORDER

In accordance with opinion filed this date, it is ORDERED:

1. Blue Shield is enjoined from implementing the so-called ban on balance billing effective as of the first day of the month following that in which this judgment becomes final.

2. Complaint dismissed as to Blue Cross.

3. Complaint dismissed as to the Massachusetts Commissioner of Insurance, intervenor-defendant.